**GARNER et al. v. UNITED STATES.**

Nos. 9930, 9931.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 31, 1949.

Decided March 28, 1949.

Writ of Certiorari Denied June 20, 1949.

See 69 S.Ct. 1502.

Messrs. Louis Jongbloet and Leonard L. Leimbach, both of Washington, D. C., for appellants.

Mr. C. Frank Reifsnyder, Asst. U. S. Atty., of Washington, D. C., with whom Messrs. George Morris Fay, U. S. Atty., and Arthur J. McLaughlin and John D. Lane, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellee.

Mr. Stafford R. Grady, Asst. U. S. Atty., of Washington, D. C., also entered an appearance, for appellee.

Before EDGERTON and WILBUR K. MILLER, Circuit Judges, and JENNINGS BAILEY, District Judge, sitting by designation.

WILBUR K. MILLER, Circuit Judge.

George A. Garner and Lawrence J. Garner were convicted of murder and sentenced to death. The principal question is whether the court erred in admitting the confessions which they made to the police before they had been presented to a committing magistrate. The appellants rely upon Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, as imperatively requiring reversal. In our view the Upshaw case does not require the conviction of these self-confessed murderers to be set aside, and we shall briefly summarize the evidence in order that decisive differences between this and the Upshaw case may be apparent.

Howard Jones was hailed by the appellants as he cruised in his taxicab on the evening of February 27, 1948. They had him drive to Third and C Streets, Southwest, and near that intersection, at the point of a pistol, they robbed him of his taxicab and the few dollars which he had. Then, with one of the Garners at the wheel and the other holding Jones in submission with the threatening weapon, they drove a short distance. Forcing Jones to alight,

EDGERTON, Circuit Judge, dissenting.

they took him into an areaway between two buildings and there began to beat him. As George Garner was striking the victim on the head with a bottle, he noticed and seized his wrist watch. Lawrence asked his brother if he should shoot him and, upon receiving an affirmative reply, he fired the fatal shot.

On February 28, 1948, George Garner told a neighbor, who testified for the government, that he and Lawrence had "gone out on a job" and somebody got hurt; if he didn't believe it to get a newspaper. The witness went to a store and returned with a paper which told of the murder of Howard Jones. George snatched the paper from him and left the scene.

Bernard Smith, a taxicab driver who was a friend of the slain man, testified that, in the early evening of February 27, he saw Howard Jones' taxicab being driven by a stranger. The name "Howard Jones" was painted on each side of the cab. Smith followed and drove alongside on two occasions in order to learn who was driving his friend's cab. He identified Lawrence Garner as the strange driver.

Thelma Harris, who had been living with George Garner as his wife for nearly two years, although he was married to another, testified as a witness for the defense. She told the jury that, during a private conversation between them at police headquarters, while they were sitting "right close together", George confessed to her his participation in the murder.[1] This evidence was not objected to, was not denied, and the confession detailed in it had no discernible connection with the admissions which George Garner made to the police.

The evidence shows that police officers went to George Garner's home about 7:30 p. m. on March 2, but there is nothing to indicate an arrest, in the sense of taking into custody, until just before the officers took him to police headquarters where he arrived between 9:00 and 9:45 p. m.[2] Moreover, George's counsel stated, "We will concede that there was no duress at his house * * *" George confessed about 10:30 p. m., after he had been at headquarters for a period somewhere between three quarters of an hour and an hour and a half, and after he had been questioned only 30 minutes. The officers went to Lawrence Garner's house about 10:30 p. m. on March 2 and took him to headquarters at 11:00 p. m., where he confessed about 2:30 a. m.

The police found Howard Jones' wrist watch, with the name "Howard" engraved on it, under George's pillow when they visited him on the evening of March 2. The murdered man's change carrier and pocketbook were recovered from the sewer where the Garners said they had thrown them. After confessing in full detail, the appellants guided the police to the place where the body had been found on the morning of February 28. At their trial they offered to show, in an effort to support their plea of insanity, that they had committed another and similar murder within a few minutes of the killing for which they were on trial. The court declined the offer.

The court heard evidence, out of the jury's presence, of the circumstances un-

---

[1] The following questions and answers appear in Thelma's cross-examination:

"Q. After you were at Headquarters for a little while, do you remember George coming out to you and telling you that he was involved in the murder of Howard Jones, the taxicab driver? A. He told me that sitting in the chair next to me.

"Q. Didn't he tell you that he was involved; that he didn't actually do the shooting; it was Lawrence who did the shooting? A. Just as soon as he told me he had anything to do with it, I broke down, and they told me to go in the other room.

* * * * * *

"Q. When you saw George and he told you he was involved in this murder, you became very emotional; isn't that right? A. Yes, sir, I did.

* * * * * *

"Q. The first time you sat side by side, did he tell you about the killing of the taxicab driver, Howard Jones? A. Yes."

[2] It is true, as said in the dissenting opinion, that a police sergeant said George Garner's arrest took place at his home about 7:35 or 7:40 p. m. But it is quite plain from all the evidence of the sergeant and the other police officer who accompanied him that George was not actually arrested, in the sense of being taken into custody, until the officers told him to accompany them to headquarters.

der which the confessions were made, and ruled that the question of admissibility should be submitted to the jury under proper instructions. When the witnesses for the government began to tell the jury of the appellants' confessions, their counsel objected "on the ground that such statements as were made, or admissions, or confessions that were obtained were by force, duress and physical violence and are not admissible in evidence." On no other ground was objection made.

The court gave a careful charge to the jury, at the conclusion of which the appellants' counsel said, "I thank the Court for a truly masterful exposition of the law." That part of the charge which had to do with the admissibility of the confessions is as follows:

"There have been introduced in evidence alleged confessions by the two defendants of the crime with which they are charged.

"The law admits a confession in evidence if it is freely and voluntarily made, because human experience shows that a confession freely and voluntarily made is likely to be relied upon. Ordinarily a person does not admit that he has committed a crime unless that admission is true.

"But the situation is otherwise if the confession or admission is obtained by duress or by coercion, or as a result of an inducement or of a misrepresentation. If a confession or admission is obtained by this means, it must be rejected and disregarded by the jury.

"Consequently, members of the jury, if you find that either of the defendants' alleged confessions or admissions was made under duress or as a result of coercion, or as the result of an inducement or misrepresentation, you must disregard that confession or admission.

"This rule is based on reason. Human experience has shown that it is not uncommon for persons to admit the commission of a crime that they have not committed, if they are under a physical, mental, or moral pressure, or if they are acting as a result of an inducement or misrepresentation.

"By 'duress or coercion' I mean both physical force and all mental or moral pressure. Confessions obtained under such circumstances are unreliable, and the law does not admit them.

"In considering whether the alleged confessions were voluntary or not, you should consider the conversations between the officers and the defendants, the time and place when the alleged confessions took place, the other persons present, the physical condition of the defendants, and all the circumstances surrounding the making of the confessions."

We cannot tell whether the jury regarded the confessions made to the police as voluntary in character and used them in part as the basis of the verdict of guilty, or whether the jury thought those confessions involuntary and based its verdict on other evidence. In either event, however, there is no issue before us as to whether the confessions were induced by physical brutality or any other sort of coercion. This is true because, if the jury determined the confessions were voluntary, its verdict was against the appellants on the question whether there was coercion by physical force or "mental or moral pressure";[3] and if the jury decided the confessions were involuntary, it disregarded them in obedience to the court's instruction.

It must be conceded, of course, that in the Upshaw opinion the McNabb[4] rule is stated as being "that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological * * *'",[5] although the Court also said in the Upshaw opinion, "In the McNabb case there were confessions 'induced by illegal detention,' * * *."[6] In view of

---

[3] In the first footnote to the Upshaw opinion, the Supreme Court said, "On this issue of physical violence the jury found against the petitioner, and therefore this issue is not involved in this case." 335 U.S. 410, at page 411, 69 S.Ct. 170.

[4] McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

[5] 335 U.S. at page 413, 69 S.Ct. at page 172.

[6] Id., 335 U.S. 413, 69 S.Ct. 171.

that holding, we must consider it to be a settled principle that, when arresting officers unnecessarily delay taking a prisoner before a committing magistrate, any confession made to them during that delay is inadmissible; and that this is true even though the confession was not induced by the illegal detention nor by any form of coercion, but was voluntarily given.

 Under this rule, however, there still remains open in every case the question whether the detention was illegal; that is, whether the delay in presenting the prisoner to a magistrate was unnecessary. For Rule 5(a) of the Federal Rules of Criminal Procedure[7] does not command that an arrested person be taken before a magistrate "forthwith". It provides that the officer "shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States." This phrasing envisages the possibility of necessary delay.[8] It would be an extension of the Upshaw opinion to construe it as holding that a confession is inadmissible if given *after delay* in presenting the defendant to a magistrate because such a construction would completely ignore the word "unnecessary" in Rule 5(a).

 As has been pointed out, George Garner confessed after he had been at police headquarters for a period somewhere between 45 minutes and one hour and a half. Lawrence Garner confessed at 2:30 a. m., having been brought to headquarters three and one-half hours before. To hold that George Garner should have been taken before a magistrate at 9:00 p. m. and that Lawrence Garner should have been presented to that official at 11:00 p. m. would presuppose that the United States commissioner or one of the judges resident in the District of Columbia who is authorized to act as a committing magistrate should have been "nearby" at those hours so that the appellants might have been carried before him. It is a matter of

common knowledge which may be judicially noticed that in this jurisdiction committing magistrates are not available late at night, and we know of no requirement of law that they or any of them should be on duty twenty-four hours a day.

 So we conclude that it was not an unnecessary delay to hold George Garner from 45 minutes to an hour and a half and to hold Lawrence Garner for three and one-half hours in the middle of the night. It is true that neither appellant was taken before a magistrate until the morning of March 3, but it is only the detention before the time of confession which is material. We learn from United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, that subsequent illegal detention does not render inadmissible a prior confession.

The trial judge in this case did not say, as did the judge in the Upshaw case, that without the confessions there was "nothing left in the case." There was substantial evidence against both appellants quite apart from the evidence of the police concerning the confessions made to them, including the testimony of a defense witness that George Garner confessed to her. It is noteworthy that the Supreme Court considered the remark of the trial judge in the Upshaw case to be of some moment, as the statement was quoted in a footnote and referred to in the following sentence in the text of the opinion, 335 U.S. at pages 410 and 411, 69 S.Ct. at page 170:

" * * * Pre-trial confessions of guilt without which petitioner could not have been convicted were admitted in evidence against his objection that they had been illegally obtained."

Moreover, no officer said in this case, as did one in the Upshaw case, that the prisoner was not taken before a magistrate because there was "not a sufficient case" for the court to hold him.

 It is still the law, we think, that necessary delay between arrest and presentation to a magistrate does not make in-

---

[7] 18 U.S.C.A.

[8] We said in Akowskey v. United States, 1946, 81 U.S.App.D.C. 353, 354, 158 F. 2d 649, 650, " * * * we recognize that in many instances the circumstances may dictate that some delay ensues between arrest and commitment amounting to one, two or many hours, * * *."

admissible disclosures to the police during that delay. In this case the periods of delay between arrests and confessions were so short as not to have been prima facie illegal, even if the arrests had been made during daylight hours. Particularly is that true with respect to George Garner. It is our view also that the attendance of a committing magistrate throughout the night is not required.

Other grounds for reversal urged by the appellants seem to us to be without substance.

Affirmed.

EDGERTON, Circuit Judge (dissenting).

The chief question is whether the court erred in admitting confessions made while appellants were held by the police, after arrest on suspicion without warrants and before commitment.

A police sergeant testified, and the government concedes, that George Garner's arrest took place at his home at 7:35 or 7:40 p. m. I understand this to mean he was taken into custody then. I know of no evidence to the contrary. George was taken to police headquarters between 9 and 9:45 p. m. He made an oral confession about 10:30 p. m. and signed a written one about 2:15 a. m. Lawrence Garner was arrested at his home at 10:30 p. m. and taken to police headquarters at 11 p. m. He admitted knowledge of the crime about 2:30 a. m. and signed a confession at 5:30 a. m. Both appellants had been questioned continuously, sometimes in the presence of many officers. Both were young Negro men of limited education. George was, at best, of limited mental capacity and emotional stability. The appellants were not taken before a committing magistrate until about 10 a. m.

There was some evidence that the police used force. Officers admitted that George Garner "finally began to cry" and that Lawrence Garner had blood on his head. A physician who examined the appellants in jail a day later found an abrasion and a number of contusions on Lawrence. The police denied using force. The court admitted the confessions in evidence and submitted to the jury the question whether they were "voluntary."

I think the recent Upshaw case shows that these confessions should have been excluded. The Supreme Court said: "In the McNabb case we held that confessions had been improperly admitted where they were the plain result of holding and interrogating persons without carrying them 'forthwith' before a committing magistrate as the law commands. * * * We held that the plain purpose of the requirement that prisoners should promptly be taken before committing mag·strates was to check resort by officers to 'secret interrogation of persons accused of crime.'[9] * * * The McNabbs were not promptly taken before a judicial officer as the law required, but instead were held for secret questioning, and '[this questioning] took place while they were in the custody of the arresting officers and before any commitment was made.' The McNabb confessions were thus held inadmissible because the McNabbs were questioned while held in 'plain disregard of the duty enjoined by Congress upon Federal officers' promptly to take them before a judicial officer. * * * The Mitchell case * * reaffirms the McNabb rule that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological

---

[9] "This procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use." McNabb v. United States, 318 U.S. 332, 344, 63 S. Ct. 608, 87 L.Ed. 819.

The dissenting Justices in the Upshaw case conceded "that a prompt hearing gives an accused an opportunity to obtain a lawyer; to secure from him advice as to maintaining an absolute silence to all questions, no matter how apparently innocuous; to gain complete freedom from police interrogation in all bailable offenses; and that these privileges are more valuable to the illiterate and inexperienced than to the educated and well-briefed accused." 335 U.S. 410, 424.

* * * * * * * We adhere to that rule."[10]

The Upshaw decision was based on Rule 5(a) of the Federal Rules of Criminal Procedure, which requires arresting officers to "take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States." The Rule and its plain purpose of checking secret interrogation were violated here. The court argues that because the Garners were arrested after office hours the delay in taking them before a magistrate was not illegal. I disagree. Upshaw was arrested at 2 a. m.[11] and the Supreme Court does not suggest that the failure of the police to take him before a magistrate did not become illegal until morning.[12] The government says committing magistrates "maintain availability for judicial business" only between 9 a. m. and 4 p. m. on week days and between 9 a. m. and noon on Saturdays. To the contrary, we said more than two years ago "both by law and practice * * * application for hearing might have been made to any of these committing magistrates at any hour."[13] Unless at least one magistrate is always available, secret interrogation cannot be prevented.

There is no evidence that a committing magistrate was not in fact available, or that delay was necessary for any other reason. There is no evidence and no contention that the police attempted to take the appellants promptly before a committing magistrate. It is plain here as in the Upshaw case that they preferred to keep their prisoners for secret interrogation. Police officers testified they told George Garner "to come along with us to Headquarters; we wanted to talk to him further" and told Lawrence Garner "we want to [take] you down to police headquarters and talk with you."

These confessions should also have been excluded for a more fundamental reason. In Haley v. Ohio a confession had been obtained, as these confessions were, during a secret interrogation which lasted several hours and in which several policemen took part. The defendant was a Negro boy of 15. The Supreme Court reversed his conviction. Four Justices said: "The trial court, after a preliminary hearing on the voluntary character of the confession, allowed it to be admitted in evidence over petitioner's objection * * *. The court instructed the jury to disregard the confession if it found that he did not make the confession voluntarily and of his free will. But the ruling of the trial court and the finding of the jury on the voluntary character of the confession do not foreclose the independent examination which it is our duty to make here. * * * The Fourteenth Amendment prohibits police from using the private, secret custody of either man or child as a device for wringing confessions from them."[14] The due process clause of the Fifth Amendment prohibits this in the District of Columbia.

---

10 Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, reversing 83 U.S.App. D.C. 207, 168 F.2d 167.

The Garners were tried during the interval between the decisions of this court and of the Supreme Court in the Upshaw case.

11 He had been held 30 hours when he confessed.

12 The opinion of the Court does not even mention the time of his arrest. The dissenting opinion mentions it in footnote 25, in the course of a detailed statement of the facts, but makes no other reference to it.

13 Akowskey v. United States, 81 U.S. App.D.C. 353, 354, 158 F.2d 649, 650.

14 Mr. Justice Douglas in Haley v. State of Ohio, 332 U.S. 596, 599, 601, 68 S.Ct. 302, 303. Three other Justices concurred in his opinion. In a separate opinion, Mr. Justice Frankfurter concurred in reversing Haley's conviction as a denial of due process. He said, 332 U. S. at pages 606–607, 68 S.Ct. 302, at page 307: "Of course, the police meant to exercise pressures upon Haley to make him talk. That was the very purpose of their procedure."