UNITED STATES of America

v.

Jose B. SALAMANCA, Appellant.

UNITED STATES of America

v.

Hector A. SALAMANCA, Appellant.

Nos. 91–3057, 91–3058.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 5, 1993.

Decided April 9, 1993.

Rehearing Denied in No. 91–3057
June 16, 1993.

William J. Garber, Washington, DC (appointed by this Court), Dennis M. Hart, was on the brief, for appellant Jose B. Salamanca.

A.J. Kramer, Federal Public Defender, Washington, DC, for appellant Hector A. Salamanca.

Michael F. Tubach, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and Theodore A. Shmanda, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before BUCKLEY, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion concurring in part and dissenting in part filed by Circuit Judge BUCKLEY.

SENTELLE, Circuit Judge:

Jose B. Salamanca appeals his conviction on a variety of counts arising from a brutal attack with a two-by-four upon a Park Police Officer. We reject his argument that the trial court erred in denying his motions to suppress a statement he made to FBI agents and evidence seized from his apartment; his argument that there was insufficient evidence relating to his specific intent to murder or maim; and his argument that the court placed improper limits on examination of his medical expert. We remand the case to the district court, however, so it can clarify the factual findings upon which his sentence was based.

Hector A. Salamanca appeals from his conviction on some of the same counts for

aiding and abetting his brother Jose's attack. We conclude there was insufficient evidence to sustain Hector's convictions for aiding and abetting and thus reverse his convictions on all counts.

## I. BACKGROUND

According to the government's evidence in appellants' joint trial, on August 12, 1990, Jose B. Salamanca and his brother Hector A. Salamanca worked together at a construction site until about 7:00 p.m., together with Jose's girlfriend Olinda Martinez. After work, they stopped at a store and bought about 24 beers and drove in two cars to Grove 13 in Rock Creek Park and began drinking. At about 11:15 that night, Park Police Officer James Culver spotted several people by a parked car and stopped to talk with them because the park had been closed since dusk. Officer Culver parked his cruiser near the car he had seen, a red four-wheel drive vehicle. He noticed that Jose and Hector were sitting next to the car holding alcoholic beverages, in violation of park rules. Officer Culver performed a sobriety test on Jose and determined that he was not able to drive. He asked both men for identification, which they gave him. Before calling in their identities to determine if they had outstanding warrants, Officer Culver decided to take the keys to Jose's car and check the car for weapons. He intended to keep the keys overnight and allow Jose to pick them up the following day when he was sober. Officer Culver saw Ms. Martinez in the front seat of the car, and asked her if she had the keys. She said she did not. Officer Culver then asked Jose for the keys. That is the last thing Officer Culver remembers about the events that night.

Ms. Martinez testified that Jose then went to his car and told her, "I will not give him the keys." Tr. 11/30/90, at 136, 172.[1] He pulled out a two-foot long two-by-four from under the front seat and smashed it over Officer Culver's head. Ms. Martinez shouted at Jose to stop, but he ignored her. She covered her face and screamed, and heard the officer being struck, but did not see who was striking him.

When Jose Salamanca first struck Officer Culver, Hector Salamanca was standing about thirty feet away from Jose and the officer. At some point in time, when Officer Culver was lying on the ground, Ms. Martinez uncovered her eyes and saw Hector "[come] over and ben[d] over near the policeman, but I don't know what he was doing." Id. at 138–39, 176. Jose then put the board back into the car, and Hector said to Jose, "[L]et's go." Id. at 140–41, 176. Jose then helped push-start Hector's car. Each drove away in his own car, with Ms. Martinez riding in Jose's car. A week before trial, Jose called Ms. Martinez and asked her to change her testimony to say that she had been drinking on the night of the assault.

After the Salamancas and Martinez had driven off, Officer Culver managed to get back to his car and radio for help at 11:35 p.m. A number of officers responded. One testified that "Officer Culver was completely drenched in blood. He had a huge laceration over his left temple and head area. His jaw apparently was hanging, flaccid. There was blood coming out of his mouth. His shirt was drenched in blood. The interior of the car was covered with hand prints of blood." Tr. 11/28/90, at 113–15. Culver described the car as a red four-by-four Toyota and the suspects as two Hispanic men and one Hispanic woman.

A helicopter transported Culver to the Washington Hospital Center. En route, he nearly died from blood clotting in his throat. Officer Culver received emergency trauma treatment and underwent extensive surgery to repair the damage done to his skull and eye. Officer Culver lived, but suffered a depressed skull fracture and a broken jaw; three teeth were knocked out, and he permanently lost sight in his left eye.

---

1. "Tr." refers to the transcript of pretrial proceedings on November 20, 21 and 26, 1990, the trial proceedings on November 27–30 and December 3–5, 1990, and the sentencing proceeding on February 22, 1991. Each transcript is designated by the date of the proceeding cited.

At the scene of the crime, officers recovered Hector Salamanca's Virginia photo identification card and Jose Salamanca's D.C. driver's license. They also found numerous Budweiser beer bottles and two empty cardboard six-pack holders. Jose Salamanca's fingerprints were on the bag containing the six-pack holders, as well as on one of the beer bottles. Hector Salamanca's fingerprints were not found on either the beer bottles or the bag.

After the assault, appellants drove to Jose's apartment where Ms. Martinez lived, and dropped her off. Hector told her that she "shouldn't say anything." Tr. 11/30/90, at 145. Jose also told her "that [she] had not seen anything and that [she] should not say anything." *Id.* at 144. Jose and Hector then drove to the house of Martha Jimenez, their half-sister, in Hyattsville, Maryland, and hid Jose's car behind her house. Appellants left together in Hector's car.

The next day, Jose told Ms. Jimenez's son, Carlos Salamanca, that he was going back to El Salvador. At Jose's instruction, Carlos took the license plates, stereo, roof rack, seat covers, and other items out of Jose's car and kept them. Carlos then drove Jose's car to an isolated wooded area two or three miles from the house and left it there. Jose left the following morning. Tr. 11/29/90, passim.

The day after the assault, Hector was arrested at his apartment, after trying to flee out the back window. Two days later, Jose was arrested pursuant to a warrant at a bus terminal in Mobile, Alabama. Before he was presented to a magistrate the next day, he made a statement to the FBI in which he admitted drinking beer in Rock Creek Park on the night of the assault.

At trial, the government presented in evidence a pair of blood-stained blue jeans recovered from Jose's apartment. A forensic serologist testified that the blood stains were at most two to three weeks old, and that the blood was a rare type found in only one percent of the population. Officer Culver is of this blood type; Jose and Hector are not. Officers also recovered a blood-stained shirt from Hector Salamanca's car two days after the assault. Blood was also found on the side of Jose's car when it was recovered four days after it was abandoned. The serologist testified that the blood on the shirt and car was human, but that blood grouping tests were inconclusive.

Jose Salamanca did not testify at trial but called several witnesses. The manager of the apartment where Jose and Hector lived testified that Jose was the head janitor at the apartment and that she believed Jose was a good person, that no tenants had complained about Jose misbehaving, and that he would occasionally drink beer. Tr. 12/3/90, at 29–32. A neighbor testified that she thought Jose was a peaceful person and she had never seen him drink. *Id.* at 36–37. Jose's step-daughter, who lived with Jose from 1982 until 1984, testified that Jose occasionally got drunk on weekends and would argue when he was drunk, but would not assault anyone. She said that when he would sober up the next day, he would not remember having argued and would apologize when told he had done so. *Id.* at 42–44. Jose also called a psychologist, who was certified as an expert and testified that after performing psychological tests on Jose, he was of the opinion that Jose suffered from "diffused brain damage," which was consistent with alcohol abuse. *Id.* at 56–63. He also testified that someone who had performed as poorly on the tests as Jose would have been substantially impaired in his capacity to think after consuming seventeen beers over several hours. *Id.* at 75–76. Finally, Jose called a witness who testified that Ms. Martinez had said a week or two before the assault that she lived with Jose because she had no job and Jose paid the rent. *Id.* at 93–95.

Hector Salamanca did not testify and called only one witness on his behalf, a detective from the United States Park Police who testified that Ms. Martinez had falsely indicated on a job application form that she had been lawfully admitted into the United States for permanent residence. *Id.* at 101–03.

The jury found Jose Salamanca guilty of assault of a federal officer with a danger-

ous weapon while he was engaged in the performance of his official duties (18 U.S.C. §§ 2, 111(b)); assault within the special territorial jurisdiction of the United States with intent to murder (18 U.S.C. §§ 2, 7, 113(a)); maiming within the special territorial jurisdiction of the United States (18 U.S.C. §§ 2, 7, 114); and attempt to kill a law enforcement officer engaged in the performance of his official duties (18 U.S.C. §§ 2, 1114). Hector was convicted on the same counts except assault with intent to murder, on which he was acquitted. Jose was sentenced to 126 months followed by three years of supervised release, and Hector was sentenced to 87 months followed by three years of supervised release.

## II. DISCUSSION

### A. Jose B. Salamanca

Jose Salamanca raises four challenges to his convictions and sentence on appeal.

#### 1. Denial of Motion to Suppress Statement to FBI and Evidence From Apartment

█ *a. The Statement to the FBI.* After Jose was arrested in Mobile, Alabama, the FBI immediately telephoned the United States Pretrial Services Agency to set up the initial appearance before a magistrate, which occurred the next afternoon, after the magistrate's office arranged for a Spanish translator. The morning after his arrest, Jose signed a *Miranda* waiver, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and was questioned by a Spanish-speaking FBI agent. According to the agent's trial testimony, during the interview Jose stated that he lived in Washington, D.C., had abandoned his red four-wheel drive Isuzu Trooper somewhere in Maryland, and was going back to El Salvador to hide because a woman had told him that "someone was looking for him." Tr. 11/29/90, at 140. He said he had lost his Washington, D.C. driver's license and could not remember where it was because he had been "drunk at one point." *Id.* at 141. He admitted that he and his brother had been drinking in Rock Creek Park on the night of the assault. He

recalled that "a vehicle arrived at the park area, stopped and then left." *Id.* at 143. Jose terminated the interview when asked what happened next. *Id.* Before trial, Jose moved to suppress his statement on the ground that there had been an "unnecessary delay" in bringing him before a magistrate, in violation of Fed.R.Crim.P. 5(a), because he was not brought before the federal magistrate until the day after his arrest. This violation was exacerbated, Jose argues, because the United States took advantage of the delay to obtain a statement from him that was later used against him at trial. *See Mallory v. United States,* 354 U.S. 449, 453, 77 S.Ct. 1356, 1358, 1 L.Ed.2d 1479 (1957).

The district court held a hearing and denied the motion. Jose assigns this denial as error. We hold that the district court did not err in denying Jose's motion. First of all, there was no unnecessary delay in presenting Jose before a magistrate. The FBI followed established procedure by notifying the Pretrial Services Agency shortly after they arrested Jose. The appearance took place within twenty-four hours, which is not unreasonable given the need to procure the services of an interpreter. *See Garner v. United States,* 174 F.2d 499, 502 (D.C.Cir.) (delay is not "unnecessary" if magistrate unavailable), *cert. denied,* 337 U.S. 945, 69 S.Ct. 1502, 93 L.Ed. 1748 (1949); *see also County of Riverside v. McLaughlin,* —— U.S. ——, ——, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991) (less than 48–hour delay in holding hearing to determine probable cause is presumptively reasonable). Jose's contention that postponing the appearance until the following day was a "dilatory" tactic on the part of the agents is belied by the fact that the time of the hearing was set by the Pretrial Services Agency. There is neither an allegation nor evidence of collusion between the agencies. *See United States v. Yunis,* 859 F.2d 953, 969 (D.C.Cir.1988); *United States v. Beltran,* 761 F.2d 1, 8 (1st Cir.1985) (suppression of statements made after undue delay in presentment not warranted in the absence of "purposeful postponement" and

"lengthy, hostile or coercive interrogation").

Jose's argument that there was an unreasonable delay is also weakened by the fact that he was arrested pursuant to a warrant. One of the primary rationales for a prompt appearance before a magistrate is to resolve the issue of probable cause, which had already been resolved when the warrant was issued. *See Yunis,* 859 F.2d at 969.

The fact that Jose signed a form waiving his *Miranda* rights, buttressed by the fact that Jose's FBI interview ceased when he said he did not want to continue, further undermines his claim that his statement was rendered involuntary by unlawful delays in presentment. The *Miranda* decision substantially undercut the need for exclusion of custodial statements solely on the ground of delay in bringing the defendant before a magistrate, as one of the purposes of appearing before a magistrate is to have the defendant's rights explained to him—rights now explained in a *Miranda* warning. *See Pettyjohn v. United States,* 419 F.2d 651, 656 (D.C.Cir.1969) ("by validly waiving his *Miranda* right to silence and an attorney, and by agreeing to speak with the police, [appellant] has thereby also waived any *Mallory* right to be brought before a magistrate 'as quickly as possible.'" (quoting *Mallory,* 354 U.S. at 454, 77 S.Ct. at 1359)), *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970).

■ *b. The Apartment Search.* Jose Salamanca's apartment was searched pursuant to a warrant after his identification was recovered near the scene of the attack. The search uncovered a pair of blue jeans stained with blood that matched Officer Culver's rare type. Jose made a pretrial motion to suppress this evidence on the ground that the affidavit supporting the warrant failed to establish probable cause to believe that evidence of the assault would be found in his apartment. The court denied his motion. He argues on appeal that this denial was in error.

Jose contends that the affidavit "admits that Jose Salamanca did not appear for work the following day and reflects that he worked as a maintenance worker at the apartment building where he lives." Jose Salamanca Br. at 37. Jose asserts that his "failure to be present at his place of employment is reasonable indicia that he was not present at his dwelling since they are at the same location." *Id.*

We conclude that the facts recited in the affidavit clearly established a "fair probability" that evidence of the assault on Officer Culver would be found at Jose's apartment. *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (upholding warrant grounded upon "practical, common-sense" deduction). The fact that Jose did not report to work supports an inference not that Jose never came to the apartment, but that he had decided to flee. It was reasonable to believe that before going into hiding, Jose would have returned to his apartment to change his clothes and gather possessions such as money.

■ In any event, even if the affidavit did not sufficiently establish a finding of probable cause, the executing officers justifiably relied in good faith on the magistrate's determination that probable cause existed, which makes the officer's reliance here immune from attack unless the affidavit on which the warrant was based was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984) (citing *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)). It is fatuous to pretend that the officers' reliance on the warrant was entirely unreasonable when Jose's license had been recovered at the scene of the crime.

*2. Sufficiency of Evidence of Specific Intent to Murder or Maim*

■ Jose Salamanca also challenges the sufficiency of the evidence relating to his conviction for assault with intent to commit murder, assault with intent to kill a federal

officer in performance of his duties, and maiming. He specifically asserts that there was insufficient evidence of his specific intent to murder or maim Officer Culver. *See United States v. Jones*, 681 F.2d 610, 611 (9th Cir.1982) ("Assault with intent to commit murder under 18 U.S.C. § 113(a) ... requires a specific intent to kill the victim, and in the special case of this offense, acting with malice by committing a reckless and wanton act without also intending to kill the victim is not sufficient for conviction."). According to Jose, "[t]he evidence produced by the government, in its very best light and with all inferences in its favor, establishes only that appellant was present in the picnic grove and that he hit Officer Culver with a stick at least one time. There is no evidence of any kind of premeditation or malice aforethought on the part of appellant." Jose Salamanca Br. at 34.

An appellant challenging the sufficiency of the evidence on which he was convicted faces an uphill struggle. Although a jury "may not base a verdict on mere speculation," it may permissibly draw a vast range of inferences from evidence. *United States v. Long*, 905 F.2d 1572, 1576 (D.C.Cir.), *cert. denied*, 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). No distinction is drawn between direct and circumstantial evidence. *United States v. Harris*, 435 F.2d 74, 88 (D.C.Cir.1970), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971). To be sufficient, "the government's evidence need not exclude all reasonable hypotheses of innocence or lead inexorably to the conclusion that the defendant is guilty." *United States v. Yonatan Teffera*, 985 F.2d 1082, 1085 (D.C.Cir.1993); *see United States v. Lam Kwong–Wah*, 924 F.2d 298, 302 (D.C.Cir.1991). We will reverse a verdict for insufficiency of evidence only if, viewing the evidence in the light most favorable to the government, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

In our judgment, the evidence supports the jury's conclusion that Jose assaulted Officer Culver with the "intent to commit murder" as required by 18 U.S.C. § 113(a), and the "intent to kill" as required by 18 U.S.C. § 114. Jose told Ms. Martinez that he was not going to allow Officer Culver to take away his car keys. While pretending to reach for his keys, he grabbed the board from under the seat and hit the Officer over the head with it. While the evidence is unclear as to exactly how many, he struck enough forceful blows to split open Culver's skull, shatter his eye socket, knock out three of his teeth, and break his jaw. Moreover, Jose did not swing the club wildly; rather, he concentrated his blows entirely to Officer Culver's head. The government suggests that under these circumstances, the jury plainly could have rationally concluded beyond a reasonable doubt that Jose intended and sought to beat Officer Culver to death. We agree. This conclusion is bolstered by the fact that the jury was instructed that it had to find that Jose acted "with the specific intent to kill." Tr. 12/4/90, at 93–94.

At oral argument, Jose Salamanca's counsel made a distinct argument that Jose could not have had *both* the specific intent to murder and the specific intent "to maim or disfigure" required by 18 U.S.C. § 114. We find this argument likewise to be unpersuasive.

There are at least two ways in which a jury could reasonably have concluded that Jose Salamanca formed the specific intent both to murder and maim. First, the jury might have concluded that Jose began the attack with the specific intent to maim, and at some point during the attack altered his intent, seeking to finish the job by killing Officer Culver. Second, the jury might have concluded that Jose held alternative intents, thinking: "Either I'll kill him, or at least put his eye out."

We therefore conclude there was sufficient evidence for a jury rationally to conclude that Jose Salamanca had the requisite specific intent *both* to murder and maim. We do not think these conclusions

are inconsistent.[2]

### 3. Restrictions on Scope of Cross Examination of Medical Expert

■ At trial, Jose Salamanca called a psychologist to testify as an expert concerning the relationship between alcohol abuse and mental disease. The government objected under Fed.R.Evid. 704(b) to any opinion the psychologist might give concerning whether Jose had the mental state necessary to commit the crime with which he was charged. Rule 704(b) provides that:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed.R.Evid. 704(b). The court ruled that defense counsel could "do everything except ask him the ultimate fact." Tr. 12/3/90, at 52.

The psychologist testified that he had performed certain psychological tests on Jose Salamanca and was of the opinion that Jose suffered from "diffused brain damage," which was consistent with alcohol abuse. Tr. 12/3/90, at 56–67, 82–83. The expert testified that he had learned that Jose drank heavily on the weekends and often would not remember what he had done when he became sober. The expert

also testified that someone who had drunk as much as Jose had would have a diminished capacity to think and plan.

Jose argues his convictions must be overturned because his Sixth Amendment right to have compulsory process for obtaining witnesses in his favor, see *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973), was violated when the district court precluded the psychologist from testifying as to "whether the appellant had the ability and capacity to plan an attack on Officer Culver that night under the circumstances that were known from the evidence." Jose Salamanca Br. at 26. According to Jose, the expert testimony "concerning the appellant's inability to formulate and carry out a plan and an impairment in his thinking processes would have left the ultimate issue for the jury while assisting the jury in reaching a conclusion on that issue." *Id.* at 28.

The United States argues that although the district court properly excluded such testimony under Fed.R.Evid. 704(b), Jose Salamanca successfully elicited the substance of this testimony at trial anyway. In the prosecution's view, the expert did testify concerning Jose's ability to think on the night of the assault, saying his capacity was diminished much more than a substantial amount. The expert testified, "I think drinking [that much alcohol] over a period of a couple of hours is certainly going to diminish anybody's timing or thinking ability to a substantial amount. And probably

---

**2.** The partial dissent is of the view that there is insufficient evidence of intent to support Jose Salamanca's conviction for maiming, and that "[m]aiming is incompatible with killing." Partial Dissent at 1. We respectfully disagree. "Intent ordinarily cannot be proved directly because there is no way of fathoming and scrutinizing the operations of the human mind. But [a jury] may infer ... the defendant's intent from the surrounding circumstances." *United States v. Terry*, 422 F.2d 704, 707 (D.C.Cir.1970) (internal quotation omitted). Nor is it "always possible to prove a purpose by direct evidence, for purpose and intent are subjective facts," *id.* at n. 4. *See also United States v. Castellanos*, 731 F.2d 979, 984 (D.C.Cir.1984) ("[N]o legal distinction is made between circumstantial and direct evidence in determining whether sufficient evidence supports the verdict."). The dis-

sent complains that we speculate on what might have passed through the jurors' minds in finding an intent to maim. We disagree. Rather, we recognize that a jury may deduce "intent ... from circumstances, from things done, things said, and it may be inferred that a person intends the natural and probable consequences of his acts." *Allen v. United States*, 420 F.2d 223, 225 n. 1 (D.C.Cir.1969) (internal quotation omitted). Just as affirming the jury's conviction on the count involving an intent to kill requires us to suppose that the jury reasoned from the acts of the defendant to a conclusion concerning his intended consequences, so does the affirmation of the maiming count. The one is neither more nor less speculative than the other. Our colleague's conclusions regarding specific evidence may be reasonable ones, but so were the jury's.

much more so with somebody who starts out with some real deficits in their ability to think and plan to begin with." Tr. 12/3/90, at 75–76. The expert then indicated that based upon his testing and expert opinion, Jose Salamanca had such deficits. *Id.* According to the government, "[t]his is almost precisely the testimony that appellant now complains he was precluded from eliciting," although the actual questioning was couched as a "hypothetical" which assumed " 'that Mr. Salamanca consumed like 17 or 18 bottles' " of beer. United States Br. at 44, quoting Tr. 12/3/90, at 75.

We review the district court's decision whether to admit evidence under Rule 704(b) for abuse of discretion. *See United States v. Lewis,* 837 F.2d 415, 417–18 (9th Cir.), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988). In this case not only did the court not abuse its discretion, it correctly restricted the scope of the expert testimony, disallowing questioning as to "the ultimate fact," and providing leeway for Jose to elicit the witness's opinion about the capacities of a person of his purported mental condition who had consumed the quantity of beer Jose allegedly drank on the night of the assault. *See United States v. Dennison,* 937 F.2d 559, 565 (11th Cir.1991) (rejecting similar allegation of error in exclusion of testimony of defense psychologist), *cert. denied,* —— U.S. ——, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992).

### *4. Factual Findings Underlying Sentence*

■ Jose Salamanca argues he should be resentenced because the district court failed to make adequate findings under the United States Sentencing Guidelines. He argues the district court did not state on the record any conclusions as to what levels, adjustments and departures were appropriate under the Guidelines, although appellant challenged a number of the recommendations in the presentence report. *See United States v. Allen,* 898 F.2d 203, 204 (D.C.Cir.1990) (holding that the first step in any Guidelines sentence is determination with certainty that presentence report identifies the correct levels and categories of the Guidelines).

The United States, acknowledging that the court made no factual findings and did not indicate that it was rejecting appellants' arguments or that it was adhering to the presentence report, agrees that a remand is necessary to allow the district court to enter findings of fact regarding how it arrived at the particular sentence it imposed.

We agree that this case must be remanded so the district court can clarify the factual findings underlying the sentence. We note, however, that this does not mean the actual sentence imposed by the district court was necessarily erroneous, only that we cannot adequately review the statute until the factual predicate has been made explicit. *Cf. United States v. Barry,* 938 F.2d 1327, 1337 (D.C.Cir.1991) (*"Barry I"*) (remanding case for clarification of sentence calculation under Guidelines); *United States v. Barry,* 961 F.2d 260, 269 (D.C.Cir.1992) (*"Barry II"*) (upholding same sentence after clarification).

### B. *Hector A. Salamanca*

Hector Salamanca was convicted on the theory that he aided and abetted his brother's assault on Officer Culver. 18 U.S.C. § 2 provides that whoever "aids, abets, counsels, commands, induces or procures" an offense against the United States is punishable as a principal. Hector raises two other challenges to his convictions and sentence, but we need consider only his sufficiency of the evidence claim because it is dispositive.

■ Hector argues his convictions should be overturned because there was insufficient evidence that he aided and abetted the assault. As noted earlier, an appellant seeking to overturn a jury verdict for insufficient evidence bears an exceedingly heavy burden. This Court will affirm Hector's conviction if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis omitted). Our review,

however, is not "entirely toothless," *see United States v. Teffera*, 985 F.2d 1082, 1085, for "[w]e do not ... fulfill our duty through rote incantation of [the principles governing a review of sufficiency of evidence] followed by summary affirmance. We must ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law. A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation." *United States v. Long*, 905 F.2d 1572, 1576 (D.C.Cir.), *cert. denied*, 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). The sufficiency of the evidence warrants particular scrutiny when the evidence strongly indicates that a defendant is guilty of a crime other than that for which he was convicted, but for which he was not charged. Under such circumstances, a trier of fact, particularly a jury, may convict a defendant of a crime for which there is insufficient evidence to vindicate its judgment that the defendant is blameworthy. Compelling evidence that a defendant is guilty of some crime is not, however, a cognizable reason for finding a defendant guilty of another crime.

The government must prove four elements in order to convict a defendant as an aider and abettor under 18 U.S.C. § 2:

> Aiding and abetting an offense consists of four elements: "(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense."

*United States v. Harris*, 959 F.2d 246 (D.C.Cir.1992) (quoting *United States v. Raper*, 676 F.2d 841, 849 (D.C.Cir.1982)). This Court has recently made clear that "aiders and abettors must possess the same criminal intent as the principals." *United States v. North*, 910 F.2d 843, 881 n. 11 (D.C.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). *See also United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.).

Hector Salamanca argues the government did not satisfy these requirements. Hector argues that while there may have been sufficient evidence to convict him as an accessory after the fact, there is no evidence at all to support an aiding and abetting charge. Hector argues specifically that the government failed to satisfy the requirements of *Harris* because there is no evidence that Hector had any intent to facilitate the commission of the attack; no evidence of guilty knowledge on his part; and no evidence that he assisted or participated in the offense. Hector Salamanca Br. at 23. Hector asserts that "Jose's action was a bizarre, unprovoked act. There is no evidence [Hector] had any idea Jose was about to do such a thing." Hector Salamanca Br. at 23–24.

 In its brief and at oral argument, the government identifies what it contends are indicia of Hector aiding and abetting Jose's assault on Officer Culver. First, the United States asserts that Hector's "claim that he did not know an offense was being committed is frivolous." United States Br. at 16. We agree that such a claim would be frivolous; but such is not Hector's claim. It is uncontroverted that during and after the attack, Hector was aware of the assault. But this alone does not make out the government's case. It is well settled that mere presence at the scene of a crime and awareness that a crime is being committed is insufficient to support a conviction for aiding and abetting. *See United States v. Poston*, 902 F.2d 90, 95 (D.C.Cir.1990); *United States v. Grey Bear*, 828 F.2d 1286, 1292 (8th Cir. 1987) ("mere presence at the scene of the crime is insufficient proof on which to base an aiding and abetting conviction"). Hector's contention is not that he did not know an attack took or was taking place, but that he did not know it was going to take place and did nothing to encourage or facilitate it while it was taking place. There is no evidence in this case that Hector had any advance knowledge of Jose's intention to assault Officer Culver.

Second, the United States argues Hector's intent to assist or participate in the

crime may be inferred from his actions after the attack, including helping Jose to flee, his attempts to conceal evidence, and his efforts to elude the police after the assault. The government notes that after the assault, Hector said "Let's go." Tr. 11/30/90, at 141. According to the government:

> [t]his matter-of-fact appraisal that the wisest course was to leave the park is not only inconsistent with Hector's claim to being an innocent bystandér who has just seen his brother cudgel a police officer's head with a wooden board, but also indicates a concert of action between Hector and his brother—Hector did not say, *"You* had better get out of here."

United States Br. at 20 (emphasis in original). The United States' emotive reminder of the brutality of the attack is unnecessary to convince this Court that a terrible crime was committed. The government is correct that Hector's behavior after the assault is strong evidence that Hector committed a felony—accessory after the fact or misprision—but not the crime of which he was convicted. *See United States v. Shulman*, 624 F.2d 384, 387 (2d Cir.1980) ("A person cannot be found guilty of aiding and abetting a crime that already has been committed."); *United States v. Barlow*, 470 F.2d 1245, 1249 (D.C.Cir.1972) ("where the defendant merely provided assistance to the perpetrator of the actual crime after its completion—and nothing more—a conviction for aiding and abetting the principal regarding that crime cannot stand"); *Roberts v. United States*, 416 F.2d 1216 (5th Cir.1969). The statement "Let's go" notwithstanding, there is nothing in the record about Hector's behavior after the assault that indicates he was a participant in any way during the assault.

Nor do Hector's flight from the scene of the crime and his attempted flight from his apartment at the time of his arrest indicate his guilty participation in the crime of aiding and abetting. *See Bailey v. United States*, 416 F.2d 1110, 1115 (D.C.Cir.1969) (flight from the scene of a crime is of dubious probative value because "it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses") (internal quotation omitted). We do not mean to suggest that flight is irrelevant as an indicator of guilt. But in the circumstances of this case, there is nothing in Hector's flight that evinces guilt of aiding and abetting as opposed to acting as an accessory after the fact.

Third, the United States maintains that the jury could have concluded that Hector drew near during the attack and, in drawing near, "emboldened and encouraged Jose to continue his attack by indicating his willingness to assist Jose should Officer Culver have fought back." United States Br. at 19. The government's hypothesis here is intended to meet the requirement that an aider and abettor make some sort of affirmative act in support of the principal's actions. *See United States v. Raper*, 676 F.2d 841, 849 (D.C.Cir.1982) ("What is required on the part of the aider is sufficient knowledge and participation to indicate that he knowingly and wilfully participated in the offense in a manner that indicated he intended to make it succeed"); *see also United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir.1962) (Friendly, J.) (a defendant's presence at the scene of the crime may be sufficient to support a conviction for aiding and abetting if his presence "proved to have positively encouraged the perpetrator himself").

The government has two arguments to support the hypothesis that Hector drew near and gave affirmative assistance or encouragement to Jose. First, the government maintains the severity of the wounds suffered by Officer Culver suggests that the attack lasted for some time. Because Hector was only about thirty feet away, this argument goes, there was plenty of time for him to come over and embolden Jose by his presence. Second, the government points out that a shirt with a small amount of blood on it was recovered from Hector's car. The United States argues the jury could have concluded this shirt belonged to Hector, and that the blood on the shirt was from the attack. The United

States argues the jury may have reasonably concluded that Hector would have had to be near the attack in order to get blood on his shirt.

The problem with the first argument is that there simply is no evidence in the record about the duration of the attack. The attack may have lasted only a few seconds since a heavy board could inflict the sort of serious injuries suffered by Officer Culver after a few blows. Nor is there any evidence in the record about when Hector drew near. He may have approached his brother only after the attack was over. Even if he approached during the attack, it may have been to stop or discourage Jose.

As to the second argument, there is no evidence that the shirt in the car belonged to Hector rather than Jose. The medical expert could not ascertain the type or age of the blood on the shirt. Most significantly, the presence of blood on the shirt is not necessarily indicative of proximity during the attack because the injury caused arterial bleeding which spurts, and blood may have splattered on the shirt from the swinging club at some distance. Hector also could well have gotten the blood on his shirt after the attack. Ms. Martinez testified that at some point she saw Hector come near the officer and bend over him, but could not see what Hector was doing. She testified that while Hector was bending over the officer, Jose was putting the board back into his car. Tr. 11/30/90, at 140–41. In short, the bloodied shirt is not evidence of aiding and abetting.

In sum, there is nothing in evidence that supports a conclusion that Hector's presence "positively encouraged the perpetrator himself." *See United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir. 1962). Thus, we are constrained to conclude on the evidence before the court, that there was insufficient evidence to support a guilty verdict for aiding and abetting. We can understand the jury's willingness to find guilt in this case due to the brutal nature of the attack, and due to the overwhelming evidence that Hector was guilty of a felony in connection with this assault.

Hector was not, however, charged with accessory after the fact or with misprision. Thus, although the jury was left with no outlet for expressing its sense of justice than by convicting Hector of a crime for which there was not sufficient evidence, we cannot sustain that result.

## III. CONCLUSION

For the reasons stated herein, Jose Salamanca's convictions on all counts are affirmed. His case is remanded to the district court so that the sentencing judge may clarify the factual predicates underlying his sentence. Hector Salamanca's convictions are reversed because, after a careful review of the evidence, we are persuaded that no reasonable juror could have concluded beyond a reasonable doubt that Hector was an aider and abettor in Jose's attack on Officer Culver.

BUCKLEY, Circuit Judge, concurring in part and dissenting in part:

I concur in each of the court's conclusions save one: I cannot find in the record sufficient evidence to support Jose Salamanca's conviction for "destroy[ing] an eye" with "intent to maim." 18 U.S.C. § 114 (1988).

Maiming is incompatible with killing. To entertain the intent to maim, a criminal ordinarily must intend to injure his victim in one of several highly specific ways with the expectation that the victim will survive. Salamanca was convicted under a law punishing

> [w]hoever ... with intent to maim or disfigure, cuts, bites, or slits the nose, ear, or lip, or cuts out or disables the tongue, or puts out or destroys an eye, or cuts off or disables a limb or any member of another person; or [w]hoever ... with like intent, throws or pours upon another person, any scalding water, corrosive acid, or caustic substance....

18 U.S.C. § 114. This law obviously was not aimed at those who set out to kill, but meet with only partial success. Rather, it was aimed at criminals who intend to disfigure, dismember, or disable, while leaving life intact. Despite the spontaneous vi-

ciousness of his attack, Salamanca was convicted under a law directed at violence that is more calculated than random.

The court suggests two means by which the jury could have reconciled the incompatibility between killing and maiming and concluded that Jose Salamanca intended both:

> First, the jury might have concluded that Jose began the attack with the specific intent to maim, and at some point during the attack altered his intent, seeking to finish the job by killing Officer Culver. Second, the jury might have concluded that Jose held alternative intents, thinking: "Either I'll kill him, or at least put his eye out."

Court's opinion at 635. The court tries to deal with the inherent incompatibility between the intents to kill and maim by speculating on what might have passed through the jurors' minds. But to support a conviction, speculation must have some relationship to the facts placed in evidence. Here the obvious obstacle to be overcome is that evidence demonstrating the intent to kill will usually negate an inference of the intent to maim.

The court is correct, of course, in pointing out that certain courses of action could conceivably evince both intents. The trouble with its analysis is that there is not a whit of evidence to support an inference that Salamanca acted with an intent to maim. Had "he beg[un] the attack with the specific intent to maim," Salamanca would have aimed something less blunt than a two-by-four at Officer Culver's eyes, not bashed the side of his head with sufficient force to crack his skull open. If it were his purpose either to "kill [the officer], or at least put his eye out," he would have done precisely that—put his eye out as he lay helpless and bleeding. This case is indistinguishable from one in which a bullet aimed at a person's head severs an optic nerve and destroys the sight of one eye while leaving its victim alive. In such a case, as in this, the evidence would support the inference of an intent to kill; but, without more, it would not support the inference of an intent to maim. What is missing here is the "more": the evidence

that could support an alternative intent to blind.

Because I can find nothing to support an inference that Jose Salamanca acted with the specific intent to maim Officer Culver, I would overturn his conviction under 18 U.S.C. § 114.