USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

No. 96-1307

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 SAUL MANGUAL-CORCHADO,

 Defendant, Appellant.

 

No. 96-1308
 UNITED STATES OF AMERICA,

 Appellee,

 v.

 ERNESTO CIRILO-MUNOZ, a/k/a NESTY,

 Defendant, Appellant.

 

No. 96-1476
 UNITED STATES OF AMERICA,

 Appellee,

 v.

 LUIS ANTONIO RAMIREZ-YNOA,

 Defendant, Appellant.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Hector M. Laffitte, U.S. District Judge]

 

 Before

 Cyr and Lynch, Circuit Judges,

and McAuliffe, U.S. District Judge,

 

 Juan E. Alvarez, with whom Lucien B. Campbell was on brief for appellant Cirilo-Munoz. 
 Jorge L. Arroyo-Alejandro for appellant Mangual-Corchado.
 Carlos M. Sanchez La Costa for appellant Ramirez-Ynoa.
 Jeanette Mercado-Rios, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Edwin O. Vazquez, Deputy Chief Criminal Division, were on brief for appellee.

 

March 18, 1998
 

 CYR, Circuit Judge. Three youthful defendants, Saul Mangual-Corchado ("Mangual"), Luis Antonio Ramirez-Ynoa ("Ramirez") and Ernesto Cirilo-Munoz ("Cirilo"), appeal their respective convictions relating to the intentional killing of an on-duty police officer during the commission of a drug offense. See 21 U.S.C. 848(e)(1)(B); 18 U.S.C. 2. Mangual and Ramirez likewise appeal their carjacking convictions, see id. 2119, and their convictions for using a firearm to commit the carjacking, see id. 924(c). We affirm the district court judgments.
 I
BACKGROUND Over an extended period of time prior to November 1, 1994, Mangual, Jose Lugo-Sanchez ("Lugo"), and David Silva worked regular nine-hour shifts selling marijuana, cocaine, and heroin seven days a week at a "drug point" immediately outside "Cafetin El Ideal" in Trujillo Alto, Puerto Rico. Their mutual drug suppliers were Yito Morales and a person known only as "Chispo." Lugo correctly suspected that a particular drug customer ÄÄ Ivan Mejias- Hernandez ("Mejias") ÄÄ was an undercover police officer. Consequently, during late October 1994 Chispo ordered Lugo to kill Mejias. Lugo in turn promptly informed codefendant Ramirez that Mejias was to be killed on Chispo's instruction. The precise circumstances surrounding the Mejias murder are central to these appeals. 
 On November 1, shortly after beginning a regular shift with David Silva at the El Ideal drug point, Lugo began ingesting cocaine. Between 10:00 and 11:00 a.m., Officer Mejias arrived in plain clothes and took a position beside the two-door, white Suzuki hatchback which he had parked in front of El Ideal. Around 11:15 a.m., Lugo called Ramirez from a pay phone located near one entrance to the El Ideal building. Lugo informed Ramirez that Mejias had arrived, then told him to bring "the gun" ÄÄ with which Lugo proposed to kill Mejias ÄÄ and "the car" to El Ideal. Ramirez, who had no driver's license and was just learning to drive, expressed reluctance to drive the car to El Ideal himself. Undeterred, Lugo responded simply: "I know that you can handle it."
 Not later than 12:30 p.m., Ramirez arrived at El Ideal in a black Oldsmobile, with the revolver, as instructed. Cirilo arrived within ten to fifteen minutes and was greeted by Lugo. Lugo testified at trial that he said nothing to Cirilo about the impending plan to murder Mejias.
 Shortly thereafter, Lugo explained to Silva that he was going across the street to the stoop of a nearby building so he could keep an eye on the El Ideal drug point in case a customer came. Officer Mejias, with Ramirez and Silva following behind him, proceeded across the street as well. Upon reaching the stoop, Lugo and Mejias immediately engaged in a heated discussion, during which Mejias proceeded to let Lugo know that he had read Lugo's lips earlier that morning when Lugo had suggested to Silva that Mejias was a police informant. Lugo, who was continuing to ingest cocaine, became very upset and said he knew Mejias was an informant.
 As Silva and Ramirez neared the stoop, Lugo walked back to El Ideal, then returned to the stoop a short time later and asked Ramirez for the keys to the black Oldsmobile. After retrieving the Ramirez revolver from the black Oldsmobile in front of El Ideal, Lugo returned to the stoop and handed the Oldsmobile keys to Ramirez.
 While walking back toward El Ideal a third time, with the Ramirez revolver concealed in his waistband, Lugo encountered Mangual, Cirilo, and Yito Morales (who, along with Chispo, supplied the drugs Lugo and Mangual sold at the El Ideal drug point) and attempted to "fire them up" to "prenderlo" ("beat up") Mejias. After Mangual, Cirilo and Yito failed to take up Lugo's challenge, and while all four were returning to the stoop together, Mangual offered instead to circle around behind Mejias while Lugo confronted Mejias with the Ramirez revolver so they could secure the keys to the white Suzuki in which Mejias had arrived at El Ideal, and search for his weapon. After the unarmed Mejias had been seized at gunpoint as suggested by Mangual, Lugo remained near the stoop with Mejias while Ramirez, Mangual, Yito, and Silva returned to El Ideal to search the Suzuki for the suspected Mejias weapon. Lugo testified at trial, without contradiction, that Cirilo was standing "real close" as Mangual and Ramirez retrieved the Mejias weapon from the white Suzuki. Multiple palm and fingerprints, lifted from the exterior of the Suzuki on the passenger side, were identified as belonging to Cirilo as well. Lugo then reminded Mejias that he was carrying a weapon under his shirt and walked behind him from the stoop to the Suzuki. After Mejias had retrieved the keys to the Suzuki, Lugo told him to get into the Suzuki "and not to come around there anymore."
 Just as Mejias turned on the ignition and was about to leave, however, yet another young man, who also hung around El Ideal and was identified at trial only as "Papilin," told Lugo: "You have to take him . . . because he might come back." Lugo thereupon abruptly instructed Mejias, at gunpoint, to get out of the driver's seat and into the back seat of the Suzuki. While Mejias and Lugo entered the back seat, Mangual got into the driver's seat. As soon as the doors to the Suzuki were closed, Mangual drove the Suzuki out of the El Ideal parking area onto the highway and observed that "the others were following . . . in a black Oldsmobile two-door." The Suzuki, followed by the black Oldsmobile driven by Cirilo, then proceeded easterly on the highway fronting El Ideal, past a store 50 yards distant, then through two intersections to a small valley. There, notwithstanding his pleas for mercy, Mejias was shot twice by Lugo; first in the abdomen, then in the head. Two or three minutes after departing El Ideal, Mangual stopped the Suzuki at a school crossing, where Yito Morales, one of the drug suppliers, pulled alongside on a motorcycle. As soon as Lugo signaled that Mejias was already dead, Yito nodded and drove off. Moments later Lugo spotted the black Oldsmobile, and the Suzuki proceeded on. Once again the Oldsmobile followed, with Cirilo still at the wheel and Ramirez in the passenger seat.
 A little later, after noticing that the Oldsmobile was nowhere in sight, Lugo told Mangual to double back until the Suzuki came upon the Oldsmobile, whereupon the two vehicles drove into a nearby cemetery and parked. At this point in time, whether on his own initiative or on prior instruction from Yito, Ramirez asked Lugo if he was sure Mejias was dead. When Lugo said "no," Ramirez fired two shots into the victim's head, then got in the passenger seat of the Suzuki beside Mangual.
 As Cirilo and Lugo led the way from the cemetery in the black Oldsmobile, Cirilo ingested cocaine provided by Lugo. With Mangual driving and Ramirez in the passenger seat, the Suzuki followed the black Oldsmobile to a nearby quarry. There the Suzuki ÄÄ carrying the Mejias remains ÄÄ was pushed over an embankment by Ramirez and Mangual, but became suspended and did not drop to the quarry floor.
 After Ramirez and Mangual scurried back to the Oldsmobile, Cirilo drove them and Lugo to a successful getaway. Later, the $240 Lugo had removed from the dead officer's body before dumping the Suzuki was divided equally among them.
 In due course, Mangual, Ramirez, Lugo and Cirilo were indicted for aiding and abetting the murder of an on-duty police officer during the commission of a drug offense, 21 U.S.C. 848(e)(1); 18 U.S.C. 2; carjacking, id. 2119, and using a firearm during the commission of a carjacking, id. 924(c). Ultimately, Lugo entered into a plea agreement, testified for the prosecution, and received a twenty-year prison sentence. Following a ten-day trial, the jury returned verdicts against Mangual and Ramirez on all three counts. Cirilo was acquitted of the carjacking and firearm charges, but convicted of aiding and abetting the Mejias murder. All three appellants were sentenced to life imprisonment.
 II
 DISCUSSION
A. Motion to Dismiss Indictment
 (Mangual, Cirilo, Ramirez)

 Appellants first maintain that it was error to disallow their pretrial motion to dismiss the indictment. Relying on United States v. Basurto, 497 F.2d 781 (9th Cir. 1974), they argue that the indictment violated due process because the government knew it was based in material part on the testimony of Special Agent Rene F. Medina, who related to the grand jury two perjured versions of the relevant events previously provided by Lugo. 
 After a grand juror voiced concern about Lugo's credibility, Agent Medina expressed the belief that Lugo had recognized the implausibility of his first story and decided to "come clean." However, Medina did not disclose to the grand jury that Lugo, at a later debriefing, had corrected yet other "inaccuracies" in his second version. Finally, after the grand jury returned the indictment, Lugo came forward with a third version, essentially recasting the four codefendants in the respective roles later ascribed to them by Lugo at trial. 
 Appellants maintain that (i) Lugo's prevarications, as relayed by Agent Medina, were the only competent evidence upon which the grand jury could have based its indictment, (ii) Agent Medina's "come clean" characterization of Lugo's second version misled the grand jury into believing it was the whole truth, whereas it contained yet other "inaccuracies," and (iii) at the very least the government owed a duty under Basurto to return to the grand jury after Lugo had come forward with the third version. Basurto has been accorded mixed reviews, even by the court which decided it. See United States v. Bracy, 566 F.2d 649, 654-55 (9th Cir. 1977), stay denied, 435 U.S. 1301 (Rehnquist, Circuit Justice 1978) (suggesting that government's use of grandjury testimony which later proves to have been perjurious never implicates defendant's Fifth Amendment rights), cert. denied, 439 U.S. 818 (1978). For our part, we have declined to endorse Basurtoon several occasions. See United States v. Garcia-Rosa, 876 F.2d 209, 232 (1st Cir. 1989), vacated on other grounds, 498 U.S. 954 (1990); United States v. Maceo, 873 F.2d 1, 3 (1st Cir. 1989); United States v. Rivera-Santiago, 872 F.2d 1073, 1088 (1st Cir. 1989); United States v. Flaherty, 668 F.2d 566, 584 (1st Cir. 1981).
 Moreover, even under Basurto it is extremely doubtful that the variance in Lugo's descriptions of the events relayed to the grand jury by Agent Medina, however troubling, was sufficiently "material" to require dismissal of the indictment. See Basurto, 497 F.2d at 785. For one thing, after the unsuccessful attempt to exculpate himself in the first post-arrest interview, Lugo directly implicated Mangual, Ramirez, Cirilo, and himself, albeit even then without complete consistency in certain nonexculpatory details (e.g., how Mejias and Cirilo were dressed) or the respective roles of the participants.
 Furthermore, were Basurto thought to require a determination as to whether the grand jury would have indicted had it been fully apprised of all the inconsistent pretrial statements made by Lugo, we would have to respond in the affirmative, especially since the petit jury found appellants guilty beyond a reasonable doubt after an exhaustive probe into all of Lugo's prevarications, including others which occurred at trial. SeeRivera-Santiago, 872 F.2d at 1088 ("[T]his error was cured by the verdict of the petit jury, which was made aware during trial of [the government witness's] past perjury."); see also United Statesv. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994) (credibility assessments reserved for factfinder). As the trial jury found guilt beyond a reasonable doubt, we are not persuaded that a similarly informed grand jury would not have found probable cause.B. Motion to Replace Appointed Counsel (Ramirez)
 Claiming a total breakdown in the attorney-client relationship, Ramirez sought to replace court-appointed counsel three weeks before trial. He alleged that appointed counsel had refused to turn over in timely fashion documents Ramirez wished to review, refused to intervene with prison officials after Ramirez was placed in special punitive confinement, and failed to conduct an adequate investigation or to consult with Ramirez in preparing a defense.
 As there is no absolute right to replace appointed counsel, see United States v. Machor, 879 F.2d 945, 952 (1st Cir. 1989), we review the district court ruling for abuse of discretion only, United States v. Richardson, 894 F.2d 492, 496 (1st Cir. 1990), after assessing, inter alia: (i) the timeliness of the request, (ii) the adequacy of the inquiry into the defendant's concerns, and (iii) whether the conflict between client and counsel resulted in a total lack of communication and precluded an adequate defense. Id. The challenged ruling was well within the district court's discretion.
 The trial judge repeatedly urged Ramirez to particularize the grounds for his dissatisfaction with appointed counsel, then followed up with probing questions directed to counsel. Counsel assured the court that he had explained all aspects of the case to Ramirez and that he had been prepared for trial. Furthermore, Ramirez acknowledged that counsel ultimately delivered all requested documents and discussed the case with him on the five or six occasions he visited Ramirez in prison. See, e.g., United States v. Pierce, 60 F.3d 886, 891 (1st Cir. 1995) (finding no abuse, even where lawyer-client relationship was "beset with problems," because lawyer and client were "conversing with one another"). The district court did not abuse its discretion in determining that the grounds advanced by Ramirez failed to demonstrate the requisite "total lack of communication."
C. Sufficiency of the Evidence (Ramirez) Ramirez claims that the government adduced insufficient evidence to establish, beyond a reasonable doubt, all elements of the three charged offenses. See supra notes 10-12. He relies primarily on the contention that the trial testimony provided by Lugo was crucial to his conviction and that Lugo demonstrated conclusively that he is an inveterate liar. 
 Although fully informed of Lugo's prevarications, as well as the generous terms of his plea agreement with the government, the verdicts substantiate that the jury nonetheless credited Lugo's trial testimony at least in part. Lugo testified that he promptly informed Ramirez, his friend since childhood, that Chispo had ordered Lugo to kill Mejias, and that Ramirez later complied with Lugo's November 1 telephonic instruction to deliver the revolver and the black Oldsmobile to El Ideal. See United States v. Fountain, 768 F.2d 790, 798, modified on other grounds, 777 F.2d 345 (7th Cir. 1985). Moreover, the El Ideal owner on duty the morning of November 1 testified that she overheard the phone conversation Lugo had with Ramirez, during which Lugo talked about killing "the guy" (i.e., Officer Mejias). In addition, a search of the Ramirez residence disclosed incriminating circumstantial evidence corroborating Ramirez' close association with Lugo and his ready access to weapons. Nor did any other trial evidence, see, e.g., supra note 21, constrain the jury to reject Lugo's corroborated testimony that Ramirez intentionally participated in the charged offenses, see supra note 20.D. Sufficiency of the Evidence (Cirilo)
 1. Applicable Law
 The government was required to prove beyond a reasonable doubt that Mejias was murdered by Lugo, the alleged principal, and that Cirilo "consciously shared" Lugo's criminal design, associated himself with it, and actively sought to ensure its success. SeeUnited States v. Spinney, 65 F.3d 231, 235 (1st Cir. 1995); seealso United States v. Ruiz, 105 F.3d 1492, 1499 (1st Cir. 1997); United States v. Loder, 23 F.3d 586, 591 (1st Cir. 1994); United States v. Francomano, 554 F.2d 483, 486-87 (1st Cir. 1977). Thus, in the present case the specific-intent element for aiding and abetting a violation of 21 U.S.C. 848(e)(1)(B) required proof beyond a reasonable doubt that Cirilo, before the murder occurred, consciously shared Lugo's intention to kill Mejias and sought to ensure the success of the criminal enterprise by operating the black Oldsmobile used to effect the getaway after the Suzuki had been dumped. See Spinney, 65 F.3d at 235; United States v. de la Cruz-Paulino, 61 F.3d 986, 998-1000 (1st Cir. 1995). Even assuming, arguendo, that Cirilo's actions after the Mejias murder are insufficient to establish his foreknowledge, see United Statesv. Andrews, 75 F.3d 552, 557 n.5 (9th Cir.), cert. denied, 116 S. Ct. 1890 (1996), those actions may provide support for a reasonable inference regarding his foreknowledge.
 2. Standard of Review
 We review de novo the district court's determination that the jury reasonably found "each element of the crime to have been proven beyond a reasonable doubt . . . ." United States v. Houlihan, 92 F.3d 1271, 1295 (1st Cir. 1996) (reversing conviction for aiding and abetting murder) (emphasis added), cert. denied, 117 S. Ct. 963 (1997). We must consider the evidence as a whole, together with all rational inferences therefrom, in the light most favorable to the government. Loder, 23 F.3d at 589; United Statesv. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991). Where de novoreview discloses that essential jury findings on knowledge or specific intent were purely speculative, an aiding and abetting conviction cannot stand. See, e.g., Houlihan, 92 F.3d at 1295; Spinney, 65 F.3d at 235 (reversing conviction for aiding and abetting use or carrying of firearm by principal during crime of violence); de la Cruz-Paulino, 61 F.3d at 1002 (vacating conviction for aiding and abetting possession of cocaine with intent to distribute). 
 As in any case, of course, "'[w]e defer, within reason, to inferences formulated by the jury in the light of its collective understanding of human behavior in the circumstances revealed by the evidence.'" United States v. Guerrero, 114 F.3d 332, 339 (1st Cir. 1997) (quoting United States v. Passos-Paternina, 918 F.2d 979, 985 (1st Cir. 1990)). Furthermore, the jury is entitled to rely on a chain of reasonable inferences, as long as each constituent inference is rooted in the evidence. See Spinney, 65 F.3d at 237-38. Finally, it is important to point out that though the "beyond-reasonable-doubt burden applies to 'every element' of each offense charged[,] [it] neither [applies] to all the subsidiary inferences nor to 'every hypothesis consistent with the defendant's innocence.'" United States v. Roberts, 119 F.3d 1006, 1017 (1st Cir. 1997) (quoting Spinney, 65 F.3d at 234) (emphasis added).
 3. Mere Presence and Association
 Cirilo essentially maintains that his proven participation ÄÄ in operating the getaway vehicle, disposing of Mejias' body, and sharing the "spoils" removed from it ÄÄ though arguably adequate to demonstrate that he was an accessory after the fact, see 18 U.S.C. 3, did not establish the requisite preexistent intent to aid and abet the Mejias murder. See 21 U.S.C. 848(e)(1)(B); 18 U.S.C. 2; supra notes 10 & 11. Thus, Cirilo correctly contends that something more than "mere presence" and "mere association" is required, see, e.g., United States v. Montilla-Rivera, 115 F.3d 1060, 1064 (1st Cir. 1997); that is to say, the evidence, direct and circumstantial, must establish beyond a reasonable doubt that he not only associated himself in some manner with the Mejias murder, as the evidence plainly shows, seeinfra Section II.D.4, but that he did so after acquiring the requisite knowledge that Lugo intended to kill Mejias.
 For its part, the government relies first and foremost on Cirilo's presence throughout virtually the entire period immediately preceding and including the capture and abduction of Officer Mejias, Cirilo's longstanding association with Lugo and Mangual, and his direct involvement in the events which unfolded from the time the white Suzuki departed the El Ideal premises carrying Lugo, Mangual and Mejias. See, e.g., United States v. Luciano-Mosquera, 63 F.3d 1142, 1150 (1st Cir. 1995) ("mere association" defense), cert. denied, 116 S. Ct. 1879 (1996); Batista-Polanco, 927 F.2d at 18 ("mere presence" defense). 4. Evidence of Foreknowledge
 Cirilo allows that the government may have adduced sufficient evidence that he knew Lugo intended to "beat up" Officer Mejias, but argues that it adduced no direct evidence that he knew, at any time, that Lugo intended to murder Mejias. We note as well that any jury finding regarding Cirilo's foreknowledge and intent could not have been predicated on his lack of credibility, since Cirilo did not testify. Nor did any witness testify that Cirilo had been told of Lugo's lethal intentions before Mejias was abducted in the Suzuki, nor that Cirilo ever admitted knowing that Lugo harbored such intentions. See, e.g., Loder, 23 F.3d at 592 (rejecting, as "too weak," an inference that because defendant helped principal dismantle car, principal had communicated to defendant that purpose of dismantling was to facilitate an insurance fraud by the car owner, absent any evidence that defendant had been informed of the scheme, or that defendant ever mentioned the scheme). Instead, Cirilo points out, Lugo ÄÄ the chief prosecution witness and, at least arguably, the person most likely to have informed Cirilo of the murder plan ÄÄ testified without contradiction that Cirilo was completely in the dark about the murder plan on November 1. Cf. Houlihan, 92 F.3d at 1294-95.
 The prosecution need not adduce direct evidence, of course, but may rely entirely on circumstantial evidence to establish beyond a reasonable doubt each element of the crime charged, see United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995); United States v. Akinola, 985 F.2d 1105, 1109 (1st Cir. 1993), including the alleged aider and abettor's foreknowledge, seeSpinney, 65 F.3d at 235; de la Cruz-Paulino, 61 F.3d at 999 n.9; United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995); Loder, 23 F.3d at 592. In other words, "the criminal law does not place a special premium on direct evidence," O'Brien, 14 F.3d at 706, and a defendant's intent may be inferred from the circumstances and the actions of the defendant. See Valerio, 48 F.3d at 63. Moreover, where the evidence as a whole is sufficient to support the verdict, the government "need not rule out every other reasonable hypothesis of innocence." O'Brien, 14 F.3d at 706.
 A network of record facts, see supra note 3, prominently supported a rational inference that the longstanding association among Lugo, Mangual and Cirilo at El Ideal was neither entirely casual nor exclusively social. In the first place, the evidence plainly disclosed that Chispo (along with Yito Morales) supplied the drugs Lugo and Mangual ÄÄ Cirilo's constant companions at El Ideal ÄÄ sold at the El Ideal drug point. Furthermore, at trial Lugo was asked about a post-arrest FBI debriefing in which he falsely cast Cirilo as the principal planner and triggerman in the Mejias murder. At that time Lugo had informed the FBI that Cirilo committed the murder to pay off an outstanding drug debt due Chispo, the same person who ordered Lugo to kill Mejias. Although Lugo later disavowed the earlier FBI debriefing as a partial fabrication as concerned the identity of the actual killer, seegenerally supra Section II.A, he nevertheless testified at trial that Cirilo did indeed owe Chispo money, without identifying the amount or nature of the obligation. Moreover, there was neither evidence nor argument that Chispo was engaged in any otherbusiness, activity or endeavor which would account for the debt owed him by Cirilo.
 In all events, given Ramirez' demonstrated reluctance even to drive the getaway car to El Ideal, not to mention the inherent risk in relying upon an inexperienced, unlicensed driver for so dangerous and important a responsibility in these stressful circumstances, we think the suggested inference of mere presence and association is not only counterintuitive, but considerably less plausible than the inference that Cirilo was there to drive the Ramirez automobile, as corroborated by, inter alia, the ready acceptance accorded him among the three other defendants from the time he arrived at El Ideal, including most of the pre-capture period and throughout the capture and abduction. See, e.g., Montilla-Rivera, 115 F.3d at 1064 ("Criminal conspirators do not often 'welcome innocent nonparticipants as witnesses to their crimes.'"); Batista-Polanco, 927 F.2d at 18 ("[T]he factfinder may fairly infer . . . that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes."). Moreover, immediately after the doors of the Suzuki were closed Cirilo got into the driver's seat of the Ramirez Oldsmobile and followed behind the Suzuki, which was carrying Lugo, Mangual and the suspected police officer whom Cirilo had just seen captured and abducted at gunpoint moments after having been told he could leave unharmed. See supra Section I.
 In our view, therefore, the evidence supported a rational jury inference that Cirilo, who was indebted to the same drug supplier who ordered Lugo to murder Mejias, did not appear at El Ideal by mere happenstance minutes after the getaway vehicle and the murder weapon were delivered by Ramirez; nor by odd coincidence innocently associate thereafter in the high-stakes criminal enterprise of capturing, abducting, and carjacking a suspected police officer. See Guerrero, 114 F.3d at 343 ("Although these facts, in isolation, do not necessarily lead to the conclusion that the [defendants] knew . . ., in combination [] they constitute more than enough evidence to support a finding of positive knowledge . . . .") (emphasis added). For his part, Cirilo proposes no reasoned argumentation which would preclude a rational jury ÄÄ employing its experience, reason, common sense, and understanding of human behavior, see, e.g., id. at 339 ÄÄ from inferring that the three other defendants would not have welcomed him in their immediate presence during the capture, carjacking, and abduction of Officer Mejias, unless it were well understood among them that Cirilo shared their knowledge and criminal intent. See Batista-Polanco, 927 F.2d at 18. Instead, ignoring the incriminating circumstantial evidence, or according it piecemeal attention, but see O'Brien, 14 F.3d at 707, Cirilo focuses on the direct evidence which comports with his mere presence and association; principally, Lugo's testimony that Cirilo had not been told, and did not know, Mejias was to be killed, but only that he was to be assaulted.
 We address this contention against the backdrop of the entire record, viewed favorably to the government, to determine whether the aiding and abetting verdict was adequately supported. See, e.g., Guerrero, 114 F.3d at 339; O'Brien, 14 F.3d at 707. No direct evidence enabled a finding that Cirilo knew, prior to his arrival at El Ideal on November 1, that Lugo intended to harm Officer Mejias in any way. Moreover, Lugo testified without contradiction that he never told Cirilo that Mejias was to be killed, but merely urged that Cirilo, inter alios, "beat up" Mejias. We conclude nonetheless that the evidence afforded adequate support for a reasonable jury inference that Cirilo acquired the requisite knowledge in the course of the riveting events that transpired in his immediate presence, from the time Lugo attempted unsuccessfully to incite Ramirez, Mangual and Cirilo to beat up Officer Mejias, see supra Section I, through the point in time when Lugo's flagrant actions ÄÄ as Mejias was about to leave unharmed in the white Suzuki ÄÄ made it unmistakably clear that Lugo was not going to release Mejias at all. We trace these constituent inferences step by step. See Spinney, 65 F.3d at 234. Lugo's uncontroverted testimony, together with the four Cirilo prints lifted from the hood of the Suzuki itself, were sufficient to establish, beyond a reasonable doubt, that Cirilo was standing "real close" to the Suzuki as Mangual and Ramirez searched for the Mejias weapon at Lugo's direction. See supra Section I. Moreover, there was no evidence and no contention that Cirilo departed from the immediate vicinity of the Suzuki until it exited the El Ideal parking area immediately after Mejias was abducted by Lugo, at which point Cirilo, without hesitation, got into the driver's seat of the Ramirez Oldsmobile and followed the Suzuki onto the highway fronting El Ideal.
 Consequently, the jury reasonably could find that Cirilo witnessed the events which took place at this critical juncture: first, as Lugo suddenly ordered Officer Mejias to get into the driver's seat of the Suzuki "and not come around there anymore;" then, moments later, as Lugo ÄÄ in an abrupt about-face following immediately on the heels of the Papilin warning to "take" ("kill") Mejias "because he might come back" ÄÄ ordered Mejias at gunpoint to get out of the front seat and into the back seat of the Suzuki. See supra note 5. Whether the jury considered Papilin merely the messenger or something more, at that point it reasonably could conclude that the message itself ÄÄ that Mejias was not going to be released after he had been abducted ÄÄ hardly could have gone unheeded by Cirilo. See Spinney, 65 F.3d at 237 ("Jurors are 'not expected to ignore what is perfectly obvious,' but, rather, 'to take full advantage of their collective experience and common sense.'") (citations omitted). Finally, after Lugo got into the Suzuki beside Mejias, revolver in hand, Mangual replaced Mejias in the driver's seat. Whereupon Cirilo in turn promptly got behind the wheel of the Ramirez Oldsmobile and followed the Suzuki onto the highway.
 Even assuming Cirilo had not become consciously involved earlier, the jury therefore reasonably could have found that what transpired in his immediate presence, before the Suzuki departed El Ideal, undermined any inference of innocent participationthereafter, particularly in light of Cirilo's unchallenged presence among the other defendants throughout almost the entire pre-capture period and his unhesitating aid to their criminal enterprise during the post-abduction and post-murder stages. See, e.g., Batista- Polanco, 927 F.2d at 18 ("'understanding of human behavior' may ground reasonable inference from circumstantial evidence").
 For these reasons, therefore, we hold that the jury rationally could infer that Cirilo, at least by then, possessed the requisite conscious knowledge that Lugo intended to kill Mejias in order to make certain that he could not come back, as Papilin had forewarned in Cirilo's immediate presence; and further that immediately thereafter ÄÄ as plainly evidenced by his affirmative conduct ÄÄ Cirilo shared and sought to facilitate Lugo's criminal purpose by driving the getaway vehicle.
 Although the foregoing analysis is substantiated by various subsidiary inferences as well, the most telling evidence was Lugo's sudden, about-face decision not to release Mejias, which indicated unmistakably that he had heeded the Papilin warning that the defendants, inter alios, would be exposed to a greatly increased risk of apprehension, prosecution and punishment were Mejias to be released after having been abducted, carjacked and assaulted at gunpoint. Viewed in context, Lugo's decision ÄÄ that Mejias was not going to be released after all ÄÄ severely undercut any inference that Cirilo was not consciously aware, from that moment on at least, that Lugo intended to ensure that Mejias not "come back" as Papilin had advised. Notwithstanding the rapidity of the ensuing events, therefore, the flagrant developments witnessed by Cirilo immediately before the Suzuki left El Ideal plainly permitted a reasonable inference that ÄÄ by then, if not sooner ÄÄ Cirilo had (i) acquired the conscious knowledge that Mejias was to be killed and (ii) formulated the requisite intent to aid and abet the murder by following the Suzuki in the Ramirez Oldsmobile, thereby ensuring his criminal associates their only means of effecting a safe getaway.
 Accordingly, we conclude that the uncontroverted evidence that Cirilo was present earlier, when Lugo tried to incite him, Mangual, and Ramirez to assault Mejias, undermined any inference that Cirilo, from that time forward, remained a mere bystander innocently caught up in a secret plot among his longtime associates to assault and abduct a suspected police informant. Furthermore, the uncontroverted evidence that Cirilo also was present later ÄÄ as Lugo instructed Mejias to leave and not return, then countermanded that instruction in direct response to Papilin's warning that Mejias had to be killed "because he might come back" ÄÄ eroded any rational inference that Cirilo's operation of the getaway vehicle thereafter was undertaken without the requisite foreknowledge and shared intention to facilitate the Mejias murder.
 III
 CONCLUSION 
 The district court judgments are affirmed.

 - Dissent follows -
 McAULIFFE, District Judge (dissenting in part).
 Lugo's cold-blooded murder of Officer Mejias was as horrible a crime as can be committed. On that point all can agree. If the horrible nature of the murder added some weight to the record evidence supporting the aiding and abetting charge against Cirilo, then I would gladly join my colleagues in affirming his conviction. But it does not. 
 If appellate review of the sufficiency of trial evidence to support a criminal conviction beyond a reasonabledoubt, as a matter of law, means anything, then in my view we cannot affirm Cirilo's aiding and abetting conviction. The record evidence does not support that charge by a preponderance; it does not clearly and convincingly support that charge; and it is certainly not sufficient to prove beyond a reasonable doubt that Cirilo aided and abetted Lugo's murder of a police officer. 
 The majority's analysis of Cirilo's sufficiency claim is quite thorough, and I have no doubt whatsoever that my colleagues are as sincerely convinced that they are right as I am convinced they are wrong. Nevertheless, because the majority opinion, in my view, tells a tale that the record does not support, and a tale not plausible in light of the facts as I read them, I am compelled, respectfully, to register my dissent to that part of the opinion affirming Cirilo's conviction. In every other respect, I join in the majority opinion.
 Like his codefendants, Cirilo was charged with carjacking, use of a firearm in the commission of carjacking, and aiding and abetting the murder of an on-duty police officer while committing a drug offense. Unlike his codefendants, Cirilo was convicted only of the aiding and abetting charge.
The fundamental problem with Cirilo's conviction seems plain to me. The prosecutor charged Cirilo with aiding and abetting, which she could not prove, and failed to charge him with the crime she probably did prove, accessory after the fact. 
 Under similar circumstances, the Court of Appeals for the District of Columbia Circuit properly cautioned that "[t]he sufficiency of the evidence warrants particular scrutiny when the evidence strongly indicates that a defendant is guilty of a crime other than that for which he was convicted, but for which he was not charged." United States v. Salamanca, 990 F.2d 629, 638 (D.C. Cir. 1993). The risk, our sister circuit recognized, is that the jury will convict the defendant of a charged crime, despite insufficient evidence, to avoid letting a defendant they believe to be guilty of a different, uncharged, offense escape punishment. Id. That is precisely what happened here in my judgment.
 In my view, this court should not try to save the government's case against Cirilo by reading speculative assumptions into the record and knitting theories about Cirilo's pre-murder participation from those speculative threads. We should be particularly cautious here, where the government's case is completely contradicted by its chief cooperating witness, Lugo, the acknowledged murderer, who testified unequivocally that Cirilo had no advance knowledge about his plan to murder Mejias and did not assist him in committing the murder in any way. Appellate review of the legal sufficiency of evidence to support a guilty verdict involves two steps: first, the court must properly credit and interpret the record evidence; second, the court must decide whether, as a matter of law, the evidence, properly assessed and taken as a whole, would permit a rational jury to find each element of the charged crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Fulmer, 108 F.3d 1486, 1490 (1st Cir. 1997); United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). At the first step, the court considers both the direct and circumstantial evidence in the record, viewing all the evidence and resolving all reasonable inferences and credibility issues in favor of the government's theory of guilt. See United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995).
 At the second step, we must determine whether, as a matter of law, a rational jury could have found, beyond a reasonable doubt, all of the elements of the aiding and abetting charge. That is, whether Cirilo knew in advance that Lugo planned to kill Officer Mejias, and associated himself with and participated in Lugo's murder plan "as something he wished to bring about, and sought by his actions to make . . . succeed." United States v. Montilla-Rivera, 115 F.3d 1060, 1064 (1st Cir. 1997). 
 Lugo shot and murdered Officer Mejias. There is no dispute about that. As frequently happens under the Sentencing Guidelines, the murderer cut a favorable deal (twenty years) and became the government's chief cooperating witness at the trial of those he implicated. But Lugo testified repeatedly and without contradiction that Cirilo knew nothing about his plan to kill Officer Mejias before he carried it out. No one else testified differently, and no direct evidence supported the notion that Cirilo knew, beforehand, about Lugo's intent to murder, and decided, in advance, to assist, and then actually assisted Lugo. 
 The government's case against Cirilo, such as it was, necessarily relied entirely on inferences to be extracted from circumstantial evidence. While a verdict may properly be based on circumstantial evidence, and all theories of innocence need not be ruled out, United States v. Batista-Polanca, 927 F.2d 14, 17 (1st Cir. 1991), inferences that are unreasonable, unsupportable, or speculative cannot be considered in assessing evidentiary sufficiency, United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).
 The majority suggests that the jury could easily have inferred that Cirilo must have known that Lugo was going to kill Officer Mejias, and that Cirilo followed in the Oldsmobile with Ramirez (when Mejias was abducted and driven away in the Suzuki) in order to assist Lugo by providing a getaway car for use after Lugo murdered the officer. The record does not, in my view, support any of those inferences, and I do not agree that the inferences coaxed from the record by the majority to establish the elements of aiding and abetting are even plausible. But, if one does accept the majority's inferential analysis, the same inferences more persuasively, or at least equally persuasively, support Cirilo's innocence, as I discuss later. 

The Record Evidence of Aiding and Abetting
 "Criminal intent is an important element of aiding and abetting," and "[p]roof of this element demands a showing that the defendant consciously shared the principal's knowledgeof the underlying criminal act, and intended to help the principal." United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995) (emphasis added). The state of mind required by the specific intent element of aiding and abetting is the same as that required to prove the principal offense. United States v. Loder, 23 F.3d 586, 591 (1st Cir. 1994). The underlying offense charged in this case was a violation of 21 U.S.C.A. 848(e)(1)(B), which imposes penalties on one who during the commission of a drug offense "intentionally kills" a law enforcement officer while on duty. Timing is also critical. To be guilty of aiding and abetting, a defendant must know, in advance, that the crime will take place, and must choose, ahead of time, to assist in its commission (since a defendant cannot be found guilty of aiding and abetting a crime that has already occurred). Salamanca, 990 F.2d at 638-39. 
 The majority finds proof of Cirilo's advance knowledge of, and specific intent to assist in Lugo's plan to kill Mejias from the following combination of circumstances: 1) Cirilo and Lugo both owed debts to a drug dealer named Chispo, and Chispo ordered Lugo to kill Officer Mejias; 2) Cirilo, a drug user, regularly associated with Mangual and Lugo, also drug users, at El Ideal; 3) Cirilo appeared at El Ideal on November 1 only ten or fifteen minutes after Ramirez arrived; 4) although Ramirez drove the Oldsmobile to El Ideal, he was not a competent driver; and 5) Cirilo drove Ramirez's car when he and Ramirez followed Officer Mejias's car. Given those circumstances, the majority recognizes a "network" that leads to "the inference that Cirilo was there [at El Ideal] todrive the Ramirez automobile" and that he knew of the murder plan. (Emphasis added.)
 No such "network" is apparent to me. Instead, the majority's inferences seem to be based on little more than an unsupported assumption that a detailed preexisting plan to kill Officer Mejias must have existed among these drug-using teenagers, just because Lugo killed him and Cirilo was hanging around. The undisputed evidence actually shows that well before the day Lugo shot and killed Mejias, he had been under orders from his drug supplier, "Chispo," to kill the officer. Nevertheless, Lugo arrived at El Ideal on November 1
 with no weapon and no apparent plan to immediately carry out Chispo's order. No record evidence suggests that Lugo had been in contact with Cirilo that morning, or at any other time, with regard to any plan to kill Mejias. 
 After Officer Mejias arrived, and after Lugo saw the officer in his car checking the cylinder of his pistol, and after the officer became embroiled in an argument with another member of the El Ideal drug crowd, and after the whole group hurried over to watch that confrontation, then Lugo called Ramirez and told him to bring "the gun" so he could kill the officer. Lugo, who was using cocaine heavily, moved with others in his group to a house across the street from the "drug point," and Mejias joined them there. When Ramirez arrived, Lugo made no immediate effort to get the gun from the car. Instead, trying to instigate a fight, Lugo argued with Mejias about his suspicion that Mejias was an undercover agent.
 Shortly after the argument with Mejias, Lugo retrieved the pistol from Ramirez's car, but kept it hidden in his pants, covered by his shirt. Lugo then tried unsuccessfully to incite a group hanging around El Ideal, including Mangual and Cirilo, to beat up the officer. Lugo did not show his gun to the group, even though they declined his exhortation to beat up Mejias. Lugo returned to the house and forced Mejias at gun point to give Mangual the keys to his car, so the car could be searched and Mejias's weapon removed. Lugo testified that Cirilo was in El Ideal when he made these arrangements with Mangual and that Cirilo did not know what was going on, except for Lugo's earlier suggestion that they beat up the officer. 
 While Mangual and others searched the car for Mejias's gun, Cirilo came out of El Ideal and stood close by, touching the car, but did not participate in the search. Lugo watched the car and the search activity from the house across the street, holding Officer Mejias captive at gun point. Lugo decided the group had found and removed Mejias's gun because they moved away from the car. Lugo testified, "I waited and then I saw when they approached the - the -- white Suzuki, and I waited for them to get away from it. When they - when they - I saw that they had gotten away from it a bit, I - realized that they had found the weapon, the firearm. [Q. Okay.] I told Officer Ivan Mejias to get up and to walk slowly in front of me, to remember that I was armed and not to try to do anything."
 Lugo then escorted Mejias back to the car, with the gun still hidden, and told him to get into the car (the driver's seat); the keys were given to him, and Lugo told him "not to come around anymore." Mejias turned on the ignition. 
 As Officer Mejias was about to drive away, another young man ("Papilin") "came over" or "came out" to tell Lugo, in essence, that he had to kill the officer rather than let him go. At that point, Lugo's plan seemed to change again. Lugo "signalled," "using his hands in a cupped fashion as is used to say 'come'" and "called" to Mangual, who was on the other side of the car, to come over. The officer was now forced out of the driver's seat and into the back seat with Lugo, while Mangual replaced him behind the wheel. Lugo testified that as they left, "Tony [Ramirez] and Nesty [Cirilo] were at the El Ideal Cafetin - or Cafetin Ideal." The car pulled into the street and shortly after leaving El Ideal (the elapsed time was probably just a few minutes, but the record is unclear), Lugo deliberately shot the officer twice. Mangual asked Lugo, "What did you do?" and Lugo answered, "Keep driving or you're next." The noise and shock from the shots inside the car caused Mangual to lose control and drive the car off the road, suggesting that he had not expected the shooting. After they were again underway, one of Chispo's men from the drug point drove by on a motorcycle and asked what had happened (no doubt attempting to determine whether Lugo had carried out Chispo's standing order). Lugo signalled that he killed the officer.
 Even if Cirilo and Ramirez followed immediatelybehind in Ramirez's car (which is only suggested by FBI Agent Pages' summary of Mangual's pretrial statement to him, which in turn is directly contradicted by Lugo's testimony), there is simply no evidence supporting the inference that Lugo planned ahead of time to have a getaway car follow them. Lugo, the shooter, testified that there was no such plan. Furthermore, Lugo's obvious last minute change of mind (to kill rather than scare Mejias away) shows how implausible it is to draw an inference that Lugo planned to have a getaway car driven by Cirilo follow him for use after the murder. The majority seems to agree that Lugo was sending the officer away unharmed until Papilin intervened. Cirilo and Ramirez, then, had to have decided to follow the Mejias car on the spur of the moment. If any plausible inference is to be drawn from the fact that Ramirez and Cirilo followed the Mejias car, whenever they left (again, the record is confusing), it would be that Cirilo and Ramirez wanted to watch the action. But the evidence does not support an inference that Cirilo knew about and joined with and assisted Lugo's plan to murder Mejias. Absent evidence of a prearranged plan, there is simply no evidence, direct or circumstantial, that Cirilo intended to assist Lugo in murdering Mejias. Following along, like mere presence, is simply not enough in my view. Thus, evidence of specific intent, an essential element of the charged offense, is completely lacking.
 To the extent that the "network" depends in part on an inference that Chispo might have ordered Cirilo, as well as Lugo, to kill the officer, as the majority seems to suggest, I find such an inference completely implausible and entirely unsupported by anything but speculation. In addition, even if Cirilo did have independent orders to kill from Chispo, there is nothing in the record to suggest that Cirilo knew of Lugo'sorders and plans, or that he intended to assist Lugo.
 I also find no plausible inference of joint action or plan in the fact that Cirilo appeared at El Ideal ten or fifteen minutes after Ramirez arrived, since no evidence in the record purports to link their arrival times, and it is undisputed that Cirilo spent many hours at El Ideal every day, along with the usual cast of drug characters. No evidence of record suggests that Cirilo's arrival time was any different than usual on November 1, when the officer was shot.
 We all agree that "mere presence" at the scene of criminal activity, even in conjunction with knowledge of the activity, is legally insufficient to prove a defendant guilty of aiding and abetting a crime. See United States v. Guerrero, 114 F.3d 332, 342 (1st Cir.), cert. denied sub nom., Pilco v. United States, 118 S. Ct. 184 and Rivas v. United States, 118 S. Ct. 320 (1997). Nevertheless, to support their inferential theory of guilt, the majority points to the familiar adage that criminals do not ordinarily welcome innocents as witnesses to their criminal activities. See, e.g., Montilla-Rivera, 115 F.3d at 1064. My colleagues invoke the adage to show that Cirilo must have known that Lugo was planning to murder Officer Mejias, or his mere presence would not have been tolerated.
 In my view that adage is not particularly helpful in understanding this case. Cirilo was not present when Lugo shot and killed Officer Mejias; Lugo told Ramirez to get the pistol from Ramirez's car when Cirilo was not present; and Lugo made arrangements with Mangual to get the pistol from Mejias's car, when Cirilo was not present. According to Lugo, Cirilo was also not present when he and Mangual abducted Mejias and drove off in the Suzuki. (In fact, Cirilo was acquitted of the carjacking charges against him.) Contrary to the majority's conclusion, the record does not show that Lugo "allowed" Cirilo to observe or participate during any of the critical events preceding the officer's murder. All the record shows is that Cirilo was simply hanging around the El Ideal drug point, as usual, and like the usual suspects.
 In addition, the evidence shows that the only criminal activity Cirilo normally observed and participated in with Lugo, Mangual, and the rest of the El Ideal group was drug use and dealing, not murder. The record includes no evidence that Lugo, Mangual, or any of the El Ideal group had previously been involved in murders, or that murder or organized and joint violence was ever part of their routine drug activity. Apparently, neither Lugo nor any of the others were armed when they "worked" at the drug point. Lugo had to phone Ramirez to get a gun, and no one else was armed during any of the events preceding the murder. It strikes me as implausible to infer, based on this record, that because Cirilo willingly and regularly participated in illicit drug activity at El Ideal with the usual characters, he necessarily joined Lugo in murdering Mejias. Thus, while Cirilo's presence at El Ideal was hardly "innocent," since it involved continuing illegal drug dealing and use, his presence alone cannot serve to establish that he knowingly associated with Lugo on November 1 for the purpose of, and actually assisted Lugo in murdering Mejias. Certainly Cirilo's presence after the murder, and his participation in dumping the car and hiding evidence of the crime does not show, and cannot be relied on to establish his foreknowledge and intent to participate before the murder. See, e.g., Andrews, 75 F.3d at 556 n.5. 
 The majority asserts that the jury could have found that Cirilo acquired sufficient knowledge of Lugo's plan to kill during the "riveting" events just before Lugo and Mangual abducted and drove away with Mejias. But Lugo's testimony provides the only actual evidence of Cirilo's whereabouts during the critical moment when Papilin "came over" and told Lugo to kill the officer rather than let him go unharmed. Lugo said he called Mangual (not Cirilo) to come over to drive Mejias's car. Lugo also said that at that point Cirilo was away from Mejias's car in the area of and then inside El Ideal.
 The majority focuses on Lugo's testimony that Cirilo was standing right next to Mejias's car during the earliersearch for Mejias's weapon inferring that Cirilo must have heard Papilin's directive and thus knew Lugo was about to murder Mejias. Overlooking Lugo's testimony that the group moved away from the car after the successful search and before Lugo brought Mejias back to his car, and that Cirilo had moved to the area of El Ideal and then into El Ideal before Lugo departed with Mejias, the majority speculates that Cirilo, unlike the others, did not move away. Indeed, the majority postulates that Cirilo stayed right next to Mejias's car and heard and understood the significance of Papilin's instructions to Lugo, which caused an abrupt change in Lugo's plan to let Mejias drive away.
 The record does not support that view at all. Even Mangual, who was on the other side of the car, and who responded to Lugo's signal and calling of his name, apparently did not see or hear Papilin's instructions. And, notwithstanding the statement in the majority opinion, I cannot find anything in the record that supports the notion that Lugo "announced" his intention to kill Mejias at that time, or at any time. Lugo just shot Mejias, surprising even Mangual, the driver. The majority's inference that Cirilo was close enough to hear Papilin's instruction and therefore knew of Lugo's plan to kill the officer is just speculation, and speculation that is contradicted rather than supported by the record evidence. But even if all of the majority's speculation is accepted, there is no evidence that Cirilo then joined in and helped Lugo to carry out his abruptly formed murder plan, rather than just followed along to see what would happen.
 I also cannot accept as plausible the majority's inference that Lugo must have planned to have Ramirez follow in the Oldsmobile in order to have a getaway car after the murder, and that Cirilo must have been the previously arranged getaway driver, given Ramirez's lack of driving experience. As the record evidence abundantly shows, Lugo did not have a cohesive plan regarding whether, when, or how he would murder Officer Mejias. Lugo also did not plan, ahead of time, where he would shoot Mejias, or how he would dispose of the body. Lugo's uncontradicted testimony shows that he thought up the plan to dump the car and body into the quarry as he and Mangual drove along, after he shot Mejias. Thus, the evidence does not support the notion that Lugo actually anticipated his need for a getaway car, much less that Cirilo agreed in advance to provide it in an effort to facilitate a murder. As noted earlier, Lugo testified, again without contradiction, that he did not ask for Cirilo's help.

Beyond a Reasonable Doubt
 To support a guilty verdict, the record evidence, properly assessed, must permit a rational jury to find each element of the crime beyond a reasonable doubt. See, e.g., United States v. Houlihan, 92 F.3d 1271, 1295 (1st Cir. 1996), cert. denied, 117 S. Ct. 963 (1997); Spinney, 65 F.3d at 235. Association with criminals, involvement in unrelated criminal activity, presence at the scene, and assistance after the fact, simply do not provide the necessary proof of the elements of aiding and abetting. See, e.g., Andrews, 75 F.3d at 556 (defendant's "mere accompaniment," agreement to "get" the victim, and presence during the shooting insufficient to show his intent to aid and abet in the shooting); de la Cruz- Paulino, 61 F.3d at 998-1002 (defendant's presence and assistance in drug sale was in menial role rather than as "knowing participant" and comment to undercover agent to "watch out" for the police in the area at best demonstrates last minute knowledge insufficient for criminal intent); Salamanca, 990 F.2d at 640 (watching brother bludgeon officer and then helping him escape insufficient to establish intent for aiding and abetting). 
 In my view, the majority strives mightily but constructs only a thin chain of implausible inferences. But even if the majority's inferences were plausible, the inferential chain would still have to be strong enough to establish each element of aiding and abetting murder beyond a reasonable doubt in order to support Cirilo's conviction, and it is not. See United States v. Luciano-Mosquera, 63 F.3d 1142, 1152 (1st Cir. 1995), cert. denied, 116 S. Ct. 1879 (1996). "Some evidence" or a "mere modicum" of evidence is not sufficient to satisfy the reasonable doubt standard. Jackson, 443 U.S. at 320. A weak inferential chain that is contrary to uncontradicted testimony cannot, as a matter of law, support a finding of guilt beyond a reasonable doubt. See Houlihan, 92 F.3d at 1295. It must also be remembered that a jury verdict supported by some evidence does not automatically meet the constitutional requirement that the proof be sufficient, as a legal matter, to establish every element of the charged crime beyond a reasonable doubt. Compare United States v. Feinberg, 140 F.2d 592 (2d Cir. 1944) (Hand, J.) with Curley v. United States, 160 F.2d 229 (D.C. Cir. 1947). See also United States v. Taylor, 464 F.2d 240 (2d Cir. 1972). The reviewing court is constitutionally obligated to assess the evidence, notwithstanding a jury's guilty verdict, to determine whether the evidence can, legally, establish every element beyond a reasonable doubt. That "some" evidence pertinent to establishing each essential element of the charged crime can be gleaned from the record, and a particular jury returned a guilty verdict, does not necessarily establish the legal sufficiency of the evidence.
 Assessed by another measure, if the inferential evidence, taken as a whole, would be equally consistent with theories of both guilt and innocence, as it is here, a rational jury must have a reasonable doubt about the defendant's guilt. See United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995); accord Guerrero, 114 F.3d at 344. In my view, even if the majority's inferences were plausible (and they are not), the best that could be said is that the inferential evidence is equally consistent with theories of guilt and innocence: (1) Cirilo knew ahead of time that Lugo planned to kill Officer Mejias and followed with Ramirez in the Oldsmobile intending to assist in the murder plan by providing the getaway car after the murder; and (2) Cirilo knew ahead of time that Lugo planned to kill Officer Mejias and followed with Ramirez in the Oldsmobile not as a joint venturer but only to see what would happen, as the El Ideal group had eagerly watched Mejias's earlier confrontation with one of the group (Navarro). Because the majority's inferential picture is merely equally consistent with theories of guilt and innocence, their evidentiary "network" is legally insufficient to permit a rational jury to find, beyond a reasonable doubt, that Cirilo intended to helpLugo kill Officer Mejias, and actually associated with Lugo to accomplish that purpose, before Lugo shot Mejias. 
 To my mind, under any meaningful legal concept of reasonable doubt, the record evidence in this case is insufficient to show that Cirilo knew about Lugo's intent to murder in advance of the killing, and intentionally assisted in carrying out that murder. Failure of proof should make this an easy legal decision, though setting Cirilo free, given the failure to properly charge him, is as difficult for a judge as it no doubt was for the jury. See Jon O. Newman, Beyond "Reasonable Doubt", 68 N.Y.U.L.Rev. 979, 989 (1993); see alsoSalamanca, 990 F.2d at 640. In dissenting, however, I am reminded of Judge Easterbrook's comment on the propriety of reversing convictions based on insufficient evidence: 
 Nothing we do as judges in criminal cases is more important than assuring that the innocent go free. Few innocent persons reach us: prosecutor, grand jury, trial judge, and petit jury have sifted the pool of suspects. Some of the defendants who come here are innocent, but usually we can't tell which. False accusations of crime must be caught by prosecutor and petit jury; we cannot reverse a conviction just because the main witnesses may have been confused or, worse, liars. Now and again, however, a case arrives in which something transparently has gone wrong, and we must act. Every time we reverse a conviction on account of insufficient evidence, we avert many more; the standard of review in this court establishes the benchmark that guides conduct elsewhere.

United States v. de Ortiz, 883 F.2d 515, 524 (7th Cir. 1989) (Easterbrook, J. concurring); rehearing granted; judgment vacated, 897 F.2d 220 (7th Cir. 1990); decision after rehearing907 F.2d 629 (7th Cir. 1990) (Easterbrook, J.). Something transparently has gone wrong in this case in my view. Although Cirilo is no moral innocent, the evidence in this record is no more legally sufficient to prove aiding and abetting murder than it was to prove aiding and abetting carjacking.
 I would reverse Cirilo's aiding and abetting conviction because I believe the law requires that result.